STATE OF CALIFORNIA, DEPARTMENT OF EDUCATION, Petitioner,

v.

William J. BENNETT, Secretary of Education, United States Department of Education, Respondents.

Nos. 86–7273, 86–7707.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 17, 1987.

Decided Dec. 2, 1987.

Joseph R. Symkowick, Chief Counsel, Michael E. Hersher, Staff Counsel, Cal. Dept. of Educ., Sacramento, Cal., for petitioner.

Wendell L. Willkie, Gen. Counsel, John R. Mason, Office of the Gen. Counsel of the U.S. Dept. of Educ., Washington, D.C., for respondents.

Before CHOY, ALARCON and O'SCANNLAIN, Circuit Judges.

CHOY, Circuit Judge:

The State of California Department of Education ("California") petitions for review of two final decisions of the United States Secretary of Education ("Secretary") ordering California to refund a total of $250,279.94 in federal funds extended under Title I of the Elementary and Secondary Education Act that were found to have been misspent during the fiscal years 1978–1980. California contends that the Secretary improperly interpreted regulations governing the allowability of conference costs under Title I. We disagree and deny the petition.

## BACKGROUND

Under Title I of the Elementary and Secondary Education Act of 1965, Pub.L. No. 89–10, 79 Stat. 27 (codified as amended at 20 U.S.C. § 2701 et seq.),[1] the federal government provided funds to local educational agencies ("LEAs")[2] to meet the

---

1. Effective October 1, 1982, Title I was superseded by Chapter 1 of the Education Consolidation and Improvement Act of 1981, Pub.L. No. 97–35, 95 Stat. 464 (codified as amended at 20 U.S.C. § 3801 et seq.). This later legislative enactment has no bearing on this case because "absent a clear indication to the contrary ..., changes in the substantive standards governing federal grant programs do not alter obligations and liabilities arising under earlier grants." *Bennett v. New Jersey*, 470 U.S. 632, 641, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985).

2. 20 U.S.C. § 244(6) defines the term "local educational agency" to mean "a board of education or other legally constituted local school authori-

needs of educationally deprived children residing in school attendance areas with high concentrations of children from low income families. 20 U.S.C. § 2701. Title I funds were channeled from the federal government to the LEAs through state educational agencies ("SEAs")[3] such as California's.

Respecting the deeply rooted tradition of state and local control over education, Congress entrusted most of the responsibility for managing Title I programs to the SEAs. Basically, Title I contemplated that each LEA would file an application with the appropriate SEA describing the programs and projects to be conducted. 20 U.S.C. § 2731. After verifying the application's accuracy and ensuring that all proposals conform with current Title I guidelines, the SEA would distribute Title I funds to the LEA. 20 U.S.C. § 2811. The SEA in turn would receive grants from the federal government upon providing assurances to the Secretary that the LEA would spend the funds only on programs that satisfy the requirements of Title I. 20 U.S.C. § 2802(b).

In 1983, federal auditors found that during fiscal years 1978–1980 California inappropriately charged at least $743,248 to Title I for conferences and State Board of Education meetings. The United States Assistant Secretary for Elementary and Secondary Education ("Assistant Secretary") reviewed the audit report and issued a final determination letter partially sustaining the audit findings. The Assistant Secretary ruled that $335,038 in expenses associated with 16 conferences and meetings were prohibited and ordered California

to refund that sum to the United States Department of Education ("Department").[4]

California filed an application for review of this final determination with the Education Appeal Board ("EAB"). On December 17, 1985, the EAB issued its initial decision, which required California to refund $91,624.44 attributable to certain conferences that "were not particularly relevant or primarily related to Title I programs."[5]

On March 21, 1986, in response to comments and recommendations filed by California and the Assistant Secretary, the Secretary affirmed the EAB's conclusion that $91,624.44 in expenses attributable to certain conferences were improperly charged to Title I programs. However, the Secretary found that the EAB had "applied an incorrect legal standard for determining whether the expenses related to a conference are chargeable as Title I expenses." As a result, the Secretary remanded the audit to the EAB to determine if the correct legal standard affected its decision with respect to the three conferences involving $158,655.60 that the EAB had found allowable.[6]

On remand from the Secretary, the EAB reversed its earlier decision and ordered California to refund an additional $158,655.50 to the Department. The Secretary declined to review the EAB's order, which thereby became final. *See* 20 U.S.C. § 1234a(d).

California timely petitioned for review of the Secretary's final decisions ordering Cal-

---

ty having administrative control and direction of free public education in a county, township, independent, or other school district located within a State."

**3.** 20 U.S.C. § 244(7) defines the term "state educational agency" to mean "the officer or agency primarily responsible for the State supervision of public elementary and secondary schools."

**4.** In 1980, the Department of Education replaced the former Office of Education as the federal agency responsible for administering Title I. *See Bell v. New Jersey*, 461 U.S. 773, 776 n. 1, 103 S.Ct. 2187, 2189 n. 1, 76 L.Ed.2d 312 (1983). For simplicity, we will refer to both the

Office of Education and the Department of Education as the Department and to both the former Commissioner of Education and the Secretary of Education as the Secretary. *See id.*

**5.** The conferences and meetings in question were: 1) certain State Board of Education meetings, 2) the AB 65 Conferences, 3) the School Improvement Conference, 4) the Summit on Black Concerns, and 5) the Fifth Annual Bilingual Conference.

**6.** The conferences in question were: 1) the Legislative Awareness Conference, 2) the Sixth Monterey Multicultural Workshops, and 3) the Seventh Monterey Multicultural Workshops.

ifornia to refund $91,624.44 and $158,-655.50 in Title I funds.[7]

## DISCUSSION

### I

This court will not disturb the Secretary's determination that California misapplied Title I funds if the Secretary's decision reflects an application of the proper legal standards and is supported by substantial evidence. *Bennett v. Kentucky Department of Education,* 470 U.S. 656, 666, 105 S.Ct. 1544, 1550, 84 L.Ed.2d 590 (1985); *Hawaii Department of Education v. Bell,* 770 F.2d 1409, 1413–14 (9th Cir. 1985).

California's principal contention is that the Secretary applied an improper legal standard in determining whether conference costs are chargeable as expenses under Title I. Title I statutes do not expressly address conference costs but do authorize federal funds to train 1) the parents of disadvantaged children serving on the parent advisory councils;[8] 2) teachers with Title I participants in their classrooms, 20 U.S.C. § 2734(a) (1982); and 3) education aides and volunteers performing specific services related to approved Title I programs, 20 U.S.C. § 2734(*l*) (1982).

Under federal regulations in effect during fiscal years 1978–1980, "[p]ayment of Title I funds may be authorized for ... training ... [if such training is] *directly related* to ... [t]he services which such persons will perform ... in connection with an approved program or project under Title I ... [and] ... the development of competencies required if the program or project is to be effective...." 45 C.F.R. § 116.36 (1976) (emphasis added). In addition, "[c]osts [of a meeting] are allowable when the *primary purpose* of the *meeting* is the dissemination of technical information re-

lating to the grant program...." 45 C.F.R. pts. 100–100d, app. B, pt. II, § B.19.c. (1976) (emphasis added).[9]

The Secretary has interpreted these regulations to require a conference as a whole to be "directly related" to Title I issues and to have as its "primary purpose" the dissemination of technical information regarding Title I in order to qualify as a Title I expenditure. California does not challenge the validity of the federal regulations but claims that the Secretary's interpretation of the regulations imposes an improper legal standard.

An agency's interpretation of regulations it administers is entitled to substantial deference. *Natural Resources Defense Counsel, Inc. v. Hodel,* 819 F.2d 927, 929 (9th Cir.1987); *Hawaii Department of Education,* 770 F.2d at 1413. Judicial review is limited to insuring that the agency's interpretation is not "plainly erroneous or inconsistent with the regulation[s]." *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)); *Marathon Oil Co. v. United States,* 807 F.2d 759, 765 (9th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987). However, as the judiciary is the final authority on issues of statutory and regulatory construction, we will not defer to an agency's interpretation that clearly contravenes congressional intent. *Morrison–Knudsen Co., Inc. v. CHG International Inc.,* 811 F.2d 1209, 1215 (9th Cir.1987); *see Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984).

California initially argues that because the Secretary's interpretation of the regulations has an impact on state and local

---

**7.** This court has jurisdiction under 20 U.S.C. §§ 1234d, 2851.

**8.** In order to strengthen and expand parental involvement in Title I programs, Congress mandated the establishment of parent advisory councils. 20 U.S.C. § 2735(a). Each council has a majority of members who are parents of children to be served by Title I programs. 20

U.S.C. § 2735(a)(1)(A). Congress required each LEA to establish a program for training members of the advisory councils to carry out their responsibility of advising the LEA in planning, implementing, and evaluating Title I programs. 20 U.S.C. §§ 2735(b), 2735(d).

**9.** This regulation applies to all Department grant programs.

programs, it is necessarily "[f]ederal control over local decision-making." This allegedly contradicts the express intent of Congress to preserve the deeply rooted tradition of state and local control over education.

■ This contention is meritless. Congress clearly left the development of innovative compensatory programs to state and local authorities.[10] However, there is an important distinction between the "proper interpretation of congressional action which presumptively should accord state governmental units the broadest measure of respect" and "the broad power of Congress to control certain actions of state governmental units." *Bennett v. New Jersey*, 470 U.S. 632, 654–55 n. 16, 105 S.Ct. 1555, 1568 n. 16, 84 L.Ed.2d 572 (1985) (Stevens, J., dissenting) (emphasis deleted). In the present case, Congress clearly "intended to achieve a particular purpose and shaped [Title I] to insure that federal funds would be used in a manner consistent with that purpose." *Alexander v. Califano*, 432 F.Supp. 1182, 1189–90 (N.D.Cal.1977).[11] To that effect, Congress expressly authorized the Secretary to adopt such rules and regulations as he deemed appropriate. *See* 20 U.S.C. § 242(b). Under such circumstances, the fact that the Secretary's interpretation of the regulations has an impact on state and local programs is not, by itself, a ground for rejecting that interpretation.

California also contends that the Secretary's focus on an entire conference in determining the allowability of conference expenditures is an arbitrary method for determining whether particular training received at that conference fulfills a Title I need. According to California, skills necessary to implement Title I programs are typical organizational and teaching skills that are the subject of conferences not specifically devoted to Title I. However, as previously noted, federal regulations allow costs of a meeting only when the meeting's "primary purpose" concerns the "dissemination of technical information relating to the [Title I] grant program." 45 C.F.R. pts. 100–100d, app. B, pt. II, § B.19.c. (1976). Furthermore, the regulations authorize payment for training "directly related" to meeting "the special educational needs" of children identified under Title I. 45 C.F.R. § 116.36 (1976).

■ The Secretary could reasonably conclude that these regulations preclude funding for conferences that are not specifically intended to serve Title I needs. Such an interpretation does not violate congressional intent. Legislative history indicates that while Congress sought to retain "flexibility at the local level," it also meant to insure that funds were spent "to provide specific types of children in specific areas with special services above and beyond those normally provided as part of the district's regular education program." Education Amendments of 1978, H.R.Rep. No. 1137,

10. The legislative history accompanying the 1965 enactment states:

It is the intention of the proposed legislation not to prescribe the specific types of programs or projects that will be required in school districts. Rather, such matters are left to the discretion and judgment of the local public educational agencies since educational needs and requirements for strengthening educational opportunities for educationally deprived elementary and secondary school pupils will vary from State to State and district to district.

S.Rep. No. 146, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Admin.News 1446, 1454.

11. Legislative history accompanying the Elementary and Secondary Education Amendments of 1970 states:

In enacting title I, Congress did not place the full force of the Federal Government behind a particular method of education—the legislation left to local schools the decision as to what education methods are to be used in improving educational opportunities for educationally deprived children. However, the legislation does contain administrative procedures and evaluation and reporting requirements which are designed to insure that, whatever education methods are used, Federal funds are to be focused on the special educational needs of educationally deprived children. . . .

S.Rep. No. 634, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 2768, 2775.

95th Cong., 2d Sess. 4, *reprinted in* 1978 U.S.Code Cong. & Admin.News 4971, 4974. Title I is "not a program of general aid," and "[federal] administration to control use of the funds is an important feature." *Id.* at 49, *reprinted in* 1978 U.S.Code Cong. & Admin. News 4971, 5019. Thus, restricting funding to conferences that are specially or primarily designed to meet Title I goals, rather than more general educational aims, accords with the express intent of Congress.

California claims that even if Title I skills are unique, a conference not devoted primarily to Title I may nevertheless include workshops and meetings that fulfill specific Title I needs. California notes that 45 C.F.R. pts. 100–100d, app. B., pt. II, § B.19.c. (1976) does not refer to "conference" but to "meeting," which could encompass meetings or workshops that are part of a conference. California argues that to ignore this reality limits the ability of LEAs to conduct effective Title I programs, frustrating the intent of Congress to preserve local control over Title I programs. California thus disputes the Secretary's focus on the entire conference and reasons that the federal audit must take into account the use individuals make of specific workshops or meetings within a conference.

In seeking review of the federal audit determinations, California bears the burden of showing what portion, if any, of the disallowed expenditures were proper. *See* 20 U.S.C. § 1234a(b).[12] Hence, though its argument is persuasive, California cannot receive relief, for it has introduced no evidence establishing the portion of expenses attributable to particular Title I workshops and meetings within each conference.[13]

## II. *Substantial Evidence*

California argues in the alternative that even if the Secretary applied the proper legal standard in determining that California misapplied Title I funds, the Secretary's findings are not supported by substantial evidence. We disagree. The conference agendas, minutes of state education board meetings and other documents offered by California to the EAB, upon which the Secretary based his decision, constituted substantial evidence.

## III. *Prejudgment Interest*

Finally, California contends that the Secretary is without authority to charge prejudgment interest on misapplied Title I funds. This issue arises from the Department's August 15, 1986, letter advising California that collection efforts on the $91,-624.44 disallowed by the Secretary had been suspended due to California's appeal of that determination to this court. The letter informed California that "in the event the amount appealed to the Court of Appeals, or any fraction thereof, is sustained by the Court, interest will accrue at the rate of 8% per annum on that amount from March 21, 1986, the date of the Secretary's decision, until payment is received by [the Department]."

The Secretary initially contends that this court lacks jurisdiction over the issue of prejudgment interest because neither administrative decision ordering a refund of misspent funds mentions a charge of inter-

---

**12.** 20 U.S.C. § 1234a(b) provides that "[u]nless the [EAB] determines that a final audit determination lacks sufficient detail, the burden shall be upon the State or local education agency to demonstrate the allowability of expenditures disallowed in the final audit determination." *See Hawaii Department of Education,* 770 F.2d at 1418 n. 6.

**13.** In *Bennett v. Kentucky Department of Education,* 470 U.S. 656, 670, 105 S.Ct. 1544, 1553, 84 L.Ed.2d 590 (1985), the Court raised, but did not address, the scenario in which a state is held liable under Title I for previous expenditures though "its interpretation of an ambiguous re-

quirement is more reasonable than an interpretation advanced by the Secretary after the grants were made." The Court implied that in such an instance it might review the Secretary's interpretation less deferentially. *Id.* We need not decide whether a different standard of review should be applied to the Secretary's post-grant as compared to pre-grant interpretations. California has not sustained its burden of producing evidence to show the propriety of the disallowed expenditures. Hence, we need not choose between its interpretation of an "ambiguous requirement" and the Secretary's interpretation.

est.[14] However, the Department's August 15th letter makes clear that it perceives damages for noncompliance with Title I requirements to include an interest penalty as well as a return of the misspent funds, the reason obviously being that an interest charge is necessary to recapture the full value of the funds. *See West Virginia v. United States,* —— U.S. ——, 107 S.Ct. 702, 706 & n. 2, 93 L.Ed.2d 639 (1987). Thus, the administrative determination of liability implicitly includes a claim for interest.[15]

The Secretary next argues that the issue of prejudgment interest is not ripe for adjudication since the Secretary is not now attempting to collect interest. The ripeness doctrine "is intended 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.' " *Trustees for Alaska v. Hodel,* 806 F.2d 1378, 1381 (9th Cir.1986) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)).

■ To ascertain whether an administrative action is ripe "requires an evaluation of the 'fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.' " *Id.* (quoting *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515). A claim is fit for decision if issues raised are primarily legal and the administrative action is final. *Id.; National Center for Immigration Rights v. INS,* 743 F.2d 1365, 1369 (9th Cir.1984). The requirement of finality is interpreted pragmatically. *See Abbott Laboratories,* 387 U.S. at 149–51, 87 S.Ct. at 1515–16.

*Assiniboine & Souix Tribes v. Board of Oil & Gas Conservation,* 792 F.2d 782, 789 (9th Cir.1986). A court looks to whether the agency action represents the final administrative word to insure that judicial review will not interfere with the agency's decision-making process. *Compare Friedman Brothers Investment Co. v. Lewis,* 676 F.2d 1317, 1319 (9th Cir.1982) (agency memorandum approving grant of funds ripe which represented the "culmination" of administrative procedures and was not subject to reconsideration) *with FTC v. Standard Oil of California,* 449 U.S. 232, 242–43, 101 S.Ct. 488, 494, 66 L.Ed.2d 416 (1980) (agency filing of complaint before administrative law judge not a final action and not judicially reviewable before the conclusion of the administrative adjudication).

■ The decision to charge prejudgment interest satisfies the fitness requirement. In proceedings before the EAB, the Secretary has claimed "the common law authority to charge interest on outstanding debts." The Department's letter evinces the implementation of this policy. It informs California that if this court sustains the Secretary's judgment, "interest will accrue" from the date of the Secretary's decision until payment is received. Viewed pragmatically, the letter represents a final agency action that will not be reconsidered. The claim for prejudgment interest likewise represents a purely legal issue, bereft of factual uncertainties. Thus, it is fit for decision.

To be ripe for review California's claim must also satisfy the hardship requirement. Such hardship must be direct and immediate. *State of Nevada ex rel. Loux v. Herrington,* 777 F.2d 529, 535 (9th Cir.1985); *Air California,* 654 F.2d at 620. Further-

---

**14.** As a court of limited jurisdiction, this court must find jurisdiction in the provisions of federal statutes. *Air California v. United States Department of Transportation,* 654 F.2d 616, 619 (9th Cir.1981); *see Bender v. Williamsport Area School District,* 475 U.S. 534, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986). Therefore, "[s]uch jurisdiction as [the court of appeals] has, to review directly the action of administrative agencies, is specially conferred by legislation relating specifically to the determinations of

such agencies made subject to review, and prescribing the manner and extent of review." *American Federation of Labor v. NLRB,* 308 U.S. 401, 404, 60 S.Ct. 300, 301, 84 L.Ed. 347 (1940).

**15.** This accords with the intent of Congress to grant courts of appeals direct review of decisions by the Secretary and EAB. *See* 20 U.S.C. §§ 1234d, 2851.

more, it must entail more than "possible financial loss." *Abbott Laboratories,* 387 U.S. at 153, 87 S.Ct. at 1518; *see Hawaiian Electric Co. v. EPA,* 723 F.2d 1440, 1445 (9th Cir.1984).

 The accrual of interest poses a "direct and immediate" threat to California by making delay of payment more costly. However, the harm that is presaged is limited to financial expense. This is an insufficient showing of hardship to justify pre-enforcement judicial review. Hence, California's claim contesting the assessment of prejudgment interest is not ripe.[16]

### CONCLUSION

California's petition for review is DENIED.

---

**16.** In any event, we note that in *Riles v. Bennett,* 831 F.2d 875 (9th Cir.1987), we reached the merits of a similar claim by California, which we rejected, thereby affirming the Secretary's right to charge prejudgment interest in order to recoup the full value of misspent funds authorized under Title I.