**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OREGON NATURAL DESERT
ASSOCIATION; CENTER FOR
BIOLOGICAL DIVERSITY,
       *Plaintiffs-Appellants,*

       v.

UNITED STATES FOREST SERVICE,
       *Defendant-Appellee,*

ROBERTSON RANCH; OREGON
CATTLEMEN'S ASSOCIATION,
       *Defendants-Intervenors-*
             *Appellees,*

       and

ROGER W. WILLIAMS, Malheur
National Forest Supervisor,
       *Defendant,*

LAURI JOYCE; PATRICK JOYCE;
CAROL ROBERTSON; J. W.
ROBERTSON,
       *Defendants-Intervenors.*

No. 05-35637

D.C. No.
CV-03-00213-REJ

OPINION

Appeal from the United States District Court
for the District of Oregon
Robert E. Jones, District Judge, Presiding

Argued and Submitted
March 7, 2006—Portland, Oregon

Filed September 21, 2006

Before: Ferdinand F. Fernandez, A. Wallace Tashima, and
Richard A. Paez, Circuit Judges.

11831

Opinion by Judge Paez;
Dissent by Judge Fernandez

**COUNSEL**

Peter M. Lacy, Oregon Natural Desert Association, Portland, Oregon; Stephanie M. Parent, Pacific Environmental Advocacy Center, Portland, Oregon, for the plaintiffs-appellants.

Kelly A. Johnson, Acting Assistant Attorney General; Karen J. Immergut, United States Attorney; Stephen J. Odell, Assistant United States Attorney; Robert H. Oakley and Jennifer J. Scheller, U.S. Department of Justice, Environment and Natural Resources Division, Washington, D.C., for the defendants-appellees.

Karen Budd-Falen and Hertha L. Lund, Budd-Falen Law Offices, LLC, Cheyenne, Wyoming, for the intervenors-defendants-appellees.

**OPINION**

PAEZ, Circuit Judge:

This appeal presents the narrow question whether the United States Forest Service's issuance of annual operating instructions ("AOIs") to permittees who graze livestock on national forest land constitutes final agency action for purposes of judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702-706. The district court held that the AOIs were not final within the meaning of Section 10(c) of the APA, 5 U.S.C. § 704, and dismissed plaintiffs' lawsuit for lack of subject matter jurisdiction. We conclude that the Forest Service's action in issuing the AOIs is "final agency action" under § 704 and therefore that plaintiffs' claims are ripe for judicial review. Accordingly, we reverse the district court's dismissal order and remand for a determination of the merits of plaintiffs' claims.[1]

**I.**

The Federal Land Policy and Management Act of 1976 ("FLPMA"), 90 Stat. 2744 (codified at 43 U.S.C. §§ 1701-1784), authorizes the Forest Service to allow livestock grazing on specified allotments[2] within a national forest. The Forest Service authorizes and manages grazing on specified allotments by issuing (1) a grazing permit pursuant to 43

---

[1]We review *de novo* the district court's determination that it lacked subject matter jurisdiction. *Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1226 (9th Cir. 2005). We therefore do not defer to the agency's position on whether agency action is final. *See Abramowitz v. EPA*, 832 F.2d 1071, 1075 (9th Cir. 1987), *superseded by statute on other grounds as recognized in Hall v. EPA*, 263 F.3d 926, 937 (9th Cir. 2001).

[2]An allotment is a "designated area of land available for livestock grazing." 36 C.F.R. § 222.1(b)(1). The administrative record reflects that the Forest Service divides an allotment into several smaller "units," or pastures.

U.S.C. § 1752(a) and 36 C.F.R. § 222; (2) an Allotment Management Plan ("AMP") pursuant to 43 U.S.C. § 1752(d) and 36 C.F.R. § 222.1(b); and (3) AOIs.[3]

A grazing permit is a "document authorizing livestock to use National Forest System or other lands under Forest Service control for the purpose of livestock production." 36 C.F.R. § 222.1(b)(5); 43 U.S.C. § 1702(p). A permit grants a license to graze and establishes: (1) the number, (2) kind, (3) and class of livestock, (4) the allotment to be grazed, and (5) the period of use. *See* 36 C.F.R. §§ 222.1-222.4; 43 U.S.C. § 1752. The Forest Service sets these parameters based on its assessment of the land's ability to sustain average levels of livestock use according to the applicable land and resource management plan.[4] *See, e.g.*, 36 C.F.R. § 222.3(c)(1); Forest Service Handbook ("FSH") 2209.13, § 94.2. The Forest Service generally issues permits for ten-year periods. *See* 36 C.F.R. § 222.3(c)(1).

The Forest Service is also required to prepare an AMP for each allotment. An AMP is "a document that specifies the program of action . . . to meet [, *inter alia*,] the multiple-use, sustained yield, economic, and other needs and objectives as

___

[3]Prior to 2004, the Forest Service called AOIs "annual operating plans." We refer to these documents as AOIs regardless of whether the Forest Service issued the document prior to the change in name.

[4]"The [Forest] Service makes forest management decisions by developing a Land and Resource Management Plan ("forest plan") for each unit of the National Forest System . . . . The [National Forest Management Act of 1976 ("NFMA"), 90 Stat. 2949, 16 U.S.C. §§ 1600-1614] and [S]ervice regulations [*see* 36 C.F.R. § 219.10] require that proposed actions be consistent with the Forest Plan. 16 U.S.C. § 1604(I). In developing a forest plan, the Service is required [*inter alia*] to 'provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with [the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. §§ 528-531] and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness [ ].' 16 U.S.C. § 1604(e)(1)." *Forest Guardians v. USFS*, 329 F.3d 1089, 1092-93 (9th Cir. 2003).

determined for the lands involved" and includes provisions relating to grazing objectives "as may be prescribed by the [Forest Service], consistent with applicable law," 36 C.F.R. § 222.1(b); 43 U.S.C. §§ 1702(k)(1), 1752(d), including the applicable forest plan. While a forest plan is an overarching land management directive for an entire forest-wide unit within the National Forest System, the AMP is a land management directive for a specific allotment within a national forest that the Forest Service has designated for livestock grazing. *See Wilderness Soc'y. v. Thomas*, 188 F.3d 1130, 1133 (9th Cir. 1999) (describing AMPs as "site-specific"). The AMP must be consistent with the applicable forest plan. *See* 16 U.S.C. § 1604(I); *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1062 (9th Cir. 2002).

Finally, as reflected in the administrative record, prior to the beginning of a grazing season, the Forest Service issues an AOI to grazing permit holders. Whereas the AMP relates the directives of the applicable forest plan to the individual grazing allotment, and the grazing permit sets grazing parameters through a ten-year period, the AOI annually conveys these more long-term directives into instructions to the permittee for annual operations. *See, e.g.*, Forest Service Manual § 2212.3 (stating that the AOI "implements management decisions of the [AMP]") (chapter currently "in reserve," but in effect at time of district court's order dismissing ONDA's claims). The AOI consists of a signed agreement between the Forest Service and permit holder. According to its explicit terms, the AOI is made part of the grazing permit and governs the permit holder's grazing operations for the next year.[5]

---

[5]The administrative record contains a number of pre-2004 AOIs that include a provision stating: "[t]his Annual Operating Instruction is made part of Part 3 of your Term Grazing Permit" and "[t]his signed AOI is your agreement to comply with the following provisions, as well as other instructions given to you, your employees, and contractors by the district ranger." It appears from the record that the Forest Service eliminated these statements from the 2004 AOIs.

Because an AOI is issued annually, it is responsive to conditions that the Forest Service could not or may not have anticipated and planned for in the AMP or grazing permit, such as drought conditions, timing and duration of rainfall over the grazing season, success or failure of habitat restoration projects, water quality, or degree of risk to threatened or endangered species affected by grazing. *See, e.g.*, *Anchustegui v. Dep't of Agric.*, 257 F.3d 1124, 1126 (9th Cir. 2001) (describing contents of an AOI that imposed reduced utilization levels in response to changed pasture conditions). With this contextual background in mind, we review briefly the statutory basis for ONDA's claims and the district court's jurisdictional ruling.

## II.

In 1988, Congress designated stretches of the North Fork Malheur and Malheur Rivers in the Blue Mountains of eastern Oregon as wild and scenic river corridors under the Wild and Scenic Rivers Act of 1968 ("WSRA"), 82 Stat. 907 (codified at 16 U.S.C. § 1274(a)(83), (89)). *See* Omnibus Oregon Wild and Scenic Rivers Act of 1988, 102 Stat. 2782. The 1990 Malheur National Forest Land and Resource Management Plan ("Malheur Forest Plan" or "Forest Plan") designates more than 10,000 acres of national forest land on and adjacent to the North Fork Malheur and Malheur River corridors as livestock grazing allotments. In this action, Oregon Natural Desert Association and Center for Biological Diversity (collectively, "ONDA") challenge the Forest Service's decisions related to its management of livestock grazing on six of those allotments from 2000 to 2004.[6] In its complaint, ONDA

---

[6]With respect to the allotments at issue in this case, portions of the Bluebucket and Dollar Basin/Star Glade allotments fall within the Malheur Wild and Scenic River corridor. Portions of the Flag Prairie, North Fork, Ott, and Spring Creek allotments fall within the North Fork Malheur Scenic River corridor. The allotments are distributed over roughly forty miles of the protected river corridors.

alleges that the Forest Service acted arbitrarily and capriciously in violation of 5 U.S.C. § 706(2)(A) by annually issuing AOIs to grazing permit holders for pastures within the protected riparian stretches of the North Fork Malheur and Malheur Rivers. ONDA alleges that the AOIs contain terms that violate the Forest Service's mandatory and non-discretionary duties under the WSRA, the National Forest Management Act of 1976 ("NFMA"), 90 Stat. 2949 (codified at 16 U.S.C. §§ 1600-1614), the National Environmental Policy Act of 1969 ("NEPA"), 83 Stat. 852 (codified at 42 U.S.C. § 4321 *et seq.*), as well as its own regulations.

In response to ONDA's action,[7] the Forest Service and the intervenors moved to dismiss for lack of jurisdiction because the AOIs at issue did not constitute final agency actions reviewable under 5 U.S.C. § 706(2)(A). *See ONDA v. USFS*, 312 F. Supp. 2d 1337, 1341-43 (D. Or. 2004). The district court initially rejected their argument and ruled that under *Bennett v. Spear*, 520 U.S. 154 (1997), the AOIs were the culmination of a process that resulted in final agency action within the meaning of § 704. *See ONDA*, 312 F. Supp. 2d at 1343. The court therefore concluded that ONDA's claims were ripe for judicial review under § 706(2)(A). *Id.*

Following denial of ONDA's motion for a preliminary injunction, *see ONDA v. USFS*, 2004 WL 1293909 (D. Or., June 10, 2004), the parties filed cross-motions for summary judgment and the case was transferred to a different district judge. The district court denied ONDA's motion and granted in part and denied in part the Forest Service's cross-motion for summary judgment. Although the district court determined that the Forest Service's issuance of an AOI constituted an

---

[7]After ONDA filed its complaint, Robertson Ranch and the Oregon Cattlemen's Association ("OCA") were granted leave to intervene as defendants. Because the intervenors assert the same jurisdictional arguments as the Forest Service, our reference to the Forest Service encompasses the intervenor-defendants, unless otherwise noted.

agency action, it concluded that the agency's action was not final and therefore not subject to judicial review under § 706(2)(A). The court also concluded that it lacked jurisdiction to review ONDA's alternative WSRA claims under § 706(1) of the APA. Accordingly, the district court dismissed ONDA's claims without prejudice. ONDA appeals the jurisdictional ruling related to its claims under § 706(2).

## III.

**[1]** Because the substantive statutes under which ONDA seeks relief do not provide for a private right of action, ONDA challenges the AOIs under the judicial review provisions of the APA. *See* 5 U.S.C. § 702-706; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990). To obtain judicial review under the APA, ONDA must challenge a final agency action. *See* 5 U.S.C. § 704; *Lujan*, 497 U.S. at 882; *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 n.1 (9th Cir. 1990) ("finality is . . . a jurisdictional requirement"). For an agency action to be final, the action must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotation marks omitted). " '[T]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.' " *Indus. Customers of NW Utils. v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)).

In determining whether an agency's action is final, we look to whether the action " 'amounts to a definitive statement of the agency's position' " or " 'has a direct and immediate effect on the day-to-day operations' " of the subject party, or if " 'immediate compliance [with the terms] is expected.' " *Indus. Customers of NW Utils*, 408 F.3d at 646 (quoting *Cal. Dep't of Water Res. v. FERC*, 341 F.3d 906, 909 (9th Cir.

2003)) (alteration in original); *see also Ukiah Valley Med. Ctr.*, 911 F.3d at 264 (quoting *FTC v. Standard Oil Co.*, 449 U.S. 232, 239 (1980)). We focus on the practical and legal effects of the agency action: "[T]he 'finality element must be interpreted in a pragmatic and flexible manner.' " *Or. Natural Res. Council v. Harrell*, 52 F.3d 1499, 1504 (9th Cir. 1995) (quoting *Dietary Supplemental Coal., Inc. v. Sullivan*, 978 F.2d 560 (9th Cir. 1992)); *Cal. Dep't of Educ. v. Bennett*, 833 F.2d 827, 833 (9th Cir. 1987) ("The requirement of finality is interpreted pragmatically.").

The Forest Service argues that an AOI is not a final agency action because the document merely implements the Forest Service's other grazing decisions as found in the Forest Plan or grazing permit. Moreover, the Forest Service argues that an AOI not only lacks finality, but also does not constitute "agency action" under the APA as interpreted by *Norton v. Southern Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 62 (2004), because it is not a rule, order, license, sanction, or relief. On both bases, the Forest Service asserts that the district court lacks subject matter jurisdiction over ONDA's claims. We are not persuaded by the Forest Service's arguments. Because an AOI is properly viewed as a license within the meaning of 5 U.S.C. § 551(13), we agree with the district court that an AOI represents agency action. We disagree, however, with the district court's determination that issuance of an AOI does not represent *final* agency action. As we explain below, issuance of an AOI satisfies the *Bennett* test for finality. It is the consummation of a process that sets the parameters for the upcoming grazing season and it imposes legal consequences on the permit holder. Thus, we conclude that ONDA's claims are ripe and that subject matter jurisdiction exists under the APA.

## A.   Agency Action

The Forest Service points to *SUWA* to support its argument that an AOI is not an agency action under the APA because,

as the Court noted in that case, "agency action is limited to the specific categories defined by the APA." *SUWA*, 542 U.S. at 55. The Court rejected several environmental groups' claims that the Bureau of Land Management ("BLM") failed to protect certain of Utah's roadless Wilderness Study Areas from off-road vehicle use in violation of the agency's duties under FLPMA and NEPA. 542 U.S. at 59-60. In contrast to the "abuse of discretion" claims ONDA pursues under § 706(2), the environmental groups in *SUWA* had pursued their claims under § 706(1), which provides jurisdiction to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* at 61.

In the Court's analysis of whether the environmental groups in *SUWA* had properly alleged the BLM's "failure to act," the Court explained the APA's meaning of agency action as defined in § 551. *Id.* at 62; *see also* 5 U.S.C. § 701(b)(2) ("For the purpose of this chapter . . . 'agency action' ha[s] the meanin[g] given . . . by section 551 of this title."). The Court noted that § 551(13) "begins" its definition of agency action with a list of "categories of decisions made or outcomes implemented by an agency—'agency rule, order, license, sanction [or] relief,' " which the Court described as "circumscribed, discrete agency actions." *SUWA*, 542 U.S. at 62 (quoting 5 U.S.C. § 551(13)) (alteration in original). The Court then noted that, under § 551(13), agency action also includes "the equivalent or denial thereof [i.e., of an agency rule, order, license, sanction, or relief], or failure to act." *Id.* The Court concluded that although "the equivalent thereof" is not defined in the APA, an " 'equivalent . . . thereof' must also be discrete." *Id.*

**[2]** The Forest Service's argument here fails because, even under § 551(13)'s categorical definition of agency action, an AOI is an agency action. A grazing permit is a license, *Anchustegui*, 257 F.3d at 1128, and the issuance of a grazing permit is an agency action under the APA. *See* 5 U.S.C. § 551(13); *Idaho Watersheds Project v. Hahn*, 307 F.3d 815,

828 (9th Cir. 2002). Under the APA, a license "includes the whole *or a part* of an agency permit . . . or other form of permission." 5 U.S.C. § 551(8) (emphasis added). As discussed above, the Forest Service itself has repeatedly included a provision in the AOIs that the AOI "is made part of Part 3 of [the] Term Grazing Permit." An AOI is therefore properly understood to be a license for purposes of determining whether it is an agency action under the APA. Thus, we agree with the district court that issuance of an AOI is an agency action under § 551(13) of the APA.

## B.  Final Agency Action

### 1.  Consummation

[3] We next turn to whether issuance of an AOI satisfies the *Bennett* test for final agency action under the APA. To meet the first prong of the *Bennett* test, the challenged agency action must represent the consummation of the agency's decisionmaking process.[8] 520 U.S. at 178. The action "must not be of a merely tentative or interlocutory nature." *Id.* Rather, we look to see whether the agency " 'has rendered its last word on the matter' " to determine whether an action is final and is ripe for judicial review. *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 478 (2001) (quoting *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 586 (1980)). The administrative record establishes that an AOI is the Forest Service's "last word" authorizing an individual permit holder to graze each season.

[4] An AOI sets forth the Forest Service's annual determinations regarding how much grazing particular units (pastures) within a given allotment can sustain in the upcoming season. As demonstrated by the record, in establishing the terms of an AOI, the Forest Service considers such matters as

---

[8]The district court did not make an explicit holding on *Bennett*'s first requirement.

changes in pasture conditions, new scientific information, new rules that have been adopted during the previous season, or the extent of the permit holder's compliance with the previous year's AOI. The AOI is a critical instrument in the Forest Service's regulation of grazing on national forest lands.

Indeed, when the Forest Service takes a site-specific action within the Malheur Forest, such as issuing a grazing permit for an allotment within the forest, the Forest Service's actions must comply with the standards and conditions set out in the Malheur Forest Plan as well as applicable federal environmental law. *See, e.g.*, 42 U.S.C. § 4332(2)(C); 16 U.S.C. § 1536(a)(2). Although the Forest Service generally implements Forest Plan standards on designated grazing allotments with an AMP, none of the allotments involved in this litigation has a current AMP.[9]

Where an AMP does not exist for an allotment, the Forest Service has integrated the Forest Plan's terms directly into the grazing permits each year through the AOI. For example, in 1996, the Forest Service issued three grazing permits for different pastures within the Bluebucket Allotment. The permits identify the general statutory and regulatory framework that governs the actions of the individual permit holders so that livestock grazing will be consistent with the Malheur Forest Plan. Part III of each grazing permit provides: "prior to completion and implementation of the scheduled individual AMP's, we will be working with you through the Annual Operating Plans [i.e., AOIs] to bring management of the Bluebucket Allotment into consistency with the terms of the Malheur [Forest Plan]." Thus, here, the Forest Service directly

---

[9]Other than the Bluebucket Allotment, for which the Forest Service prepared an AMP over twenty years ago, none of the allotments at issue in this appeal has an AMP. Each permit states that the Forest Plan has "scheduled" an AMP; however, the record does not reflect that the Forest Service has complied with these schedules. In one case, the Dollar Basin/Star Glade Allotment, the Forest Service has not completed an allotment analysis—a step preceding development of an AMP—since 1965.

"put[s] the [allotment management] decision[s] into effect" through an AOI. *Idaho Watersheds Project*, 307 F.3d at 828.

**[5]** In *Idaho Watersheds Project*, we held that the BLM's issuance of a grazing permit was a final agency action because "the initial agency decisionmaker arrived at a definitive position and put the decision into effect by issuing the . . . permits." *Id*. Here, as in *Idaho Watershed Project*, the Forest Service arrived at a definitive position to allow grazing in the Malheur National Forest and put that decision into effect by issuing grazing permits. In issuing the permits, the Forest Service reserved the right to impose additional terms and conditions in light of its annual assessment of changed pasture conditions, new scientific information, new rules, and past compliance by the permit holder. As noted, the Forest Service puts these additional modifications or restrictions into effect by issuing an AOI. As the record reflects, when viewed in its proper context, the AOI represents the consummation of the Forest Service's annual decisionmaking process regarding management of grazing allotments.[10]

**[6]** Moreover, after the Forest Service issues an AOI, the grazing permit holder is authorized to begin the new grazing season under its terms and conditions.[11] Because the AOI is the only substantive document in the annual application pro-

---

[10]To suggest that the AOIs are merely part of the Forest Service's "day-to-day operation," see Dissenting Opinion at 11857, relegates them to an insignificant role in the Forest Service's management of the grazing lands under its control. In light of the substantive legal constraints imposed by the AOIs, we are not persuaded by the dissent's argument.

[11]As documented in the administrative record, every spring, the Forest Service initiates consultation with the permit holder regarding the issuance of the AOI for the forthcoming grazing season. At the end of this consultation process, the Forest Service sets the terms and conditions for grazing in any particular allotment. Without the AOI, the permit holder would not know where within the allotment to graze, how many head to graze when, or any specific conservation measures that the Forest Service deemed warranted for the upcoming season.

cess, it functions to do more than make minor adjustments in the grazing permit as the Forest Service asserts; pragmatically, it functions to start the grazing season. In short, the AOI is the Forest Service's "last word" before the permit holders begin grazing their livestock. *Whitman*, 531 U.S. at 478; *cf. Ecology Ctr., Inc. v. USFS*, 192 F.3d 922, 925 (9th Cir. 1999) (holding that monitoring and reporting under NFMA were not agency actions that consummated the Forest Service's decisionmaking process because they were "only steps leading to an agency decision, rather than the final action itself").

[7] The Forest Service does not contest that an AOI is the Forest Service's "last word" before a permit holder begins grazing his livestock. Rather, the Forest Service asserts that an AOI merely implements other decisions that the Forest Service has already made (i.e., the Forest Plan, AMPs, and grazing permits), and therefore is not, in itself, a final agency action. This argument, however, mis-characterizes the role of an AOI in the Forest Service's management of the public range. "It is the effect of the action and not its label that must be considered." *Abramowitz*, 832 F.2d at 1075. To this end, "finality is to be interpreted 'in a pragmatic way.' " *Oregon v. Ashcroft*, 368 F.3d 1118, 1147 (9th Cir. 2004) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149-50 (1967)). It is correct, as the Forest Service argues, that, in obtaining a grazing permit, the applicant agrees to comply with the Forest Plan and other applicable federal environmental requirements. However, as the administrative record demonstrates, an AOI is the only instrument that instructs the permit holder how those standards will affect his grazing operations during the upcoming season. Although the permit holder has already agreed to abide by applicable federal environmental law in signing the term grazing permit, that acknowledgment does not diminish the force of an AOI as consummating the Forest Service's annual decisionmaking process. In sum, the issuance of an AOI represents the consummation of the Forest Service's determination regarding the extent, limitation, and

other restrictions on a permit holder's right to graze his live-stock under the terms of the permit.[12]

## 2.  Legal Effect

[8] The district court interpreted *Bennett* to hold that an

---

[12]The dissent cites *Montana Wilderness Association, Inc. v. U.S. Forest Service* and *Chemical Weapons* in support of its pragmatic assessment that the AOIs merely implement an earlier final decision. Dissenting Opinion at 11856. In *Montana Wilderness*, we held that trail maintenance did not constitute final agency action for purposes of judicial review under the APA. 314 F.3d 1146, 1150 (9th Cir. 2003), *vacated on other grounds by SUWA*. In rejecting plaintiffs' claims under the Montana Wilderness Study Act, Pub. No. 95-150, 91 Stat. 1243 (1977), we noted that the Forest Service's trail maintenance activities "implement[ed] its trail management and forest plans adopted for the study area." *Id.* We concluded that "the maintenance of trails designated by those plans [was] merely an interim aspect of the planning process, not the consummation of it." *Id.* Here, the AOIs are not part of an interim planning process. Instead, as even the dissent seems to acknowledge, the AOIs represent the consummation of a process, which results in the imposition of enforceable rights and obligations on the permittee.

In *Chemical Weapons Working Group, Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485 (10th Cir. 1997), the plaintiffs challenged the Defense Department's plan to destroy chemical weapons by incinerating them. The Tenth Circuit held that the plaintiffs' maximum protection claim was not ripe for judicial review under the APA because the two trial burns that were at issue did not constitute final agency action. In light of the Department's prior final decision to incinerate the chemical weapons, the court concluded that the later trial burns merely implemented the earlier final decision. Notably, the plaintiffs were unable to provide any information demonstrating that the Department had revisited its plan to incinerate the weapons.

The discrete circumstances in *Chemical Weapons* differ considerably from the annual process through which the Forest Service issues AOIs, as does the substantive nature of the AOIs compared to the destruction of weapons at issue in that case. The issuance of an AOI is not a discrete event designed to test the feasibility of a course of action periodically adopted by a governmental agency, but rather is a final decision that sets the annual parameters of the grazing program and which imposes legal consequences on permittees.

agency action is not a final agency action unless it "alter[s] the legal regime to which the action agency is subject." With this understanding, the district court concluded that an AOI is not a final agency action because it does not alter the legal regime to which the Forest Service is subject. The district court's understanding of *Bennett's* second prong is, however, not supported by *Bennett*. In *Bennett*, the Court held that an agency action that consummated the agency's decisionmaking process (*Bennett*'s first requirement) would be final if the action is one "by which rights *or* obligations have been determined, *or* from which legal consequences will flow." 520 U.S. at 178 (internal quotation marks omitted) (emphasis added). It then held, on the facts of that case, that this second requirement was met because the challenged action altered the legal regime to which the Secretary of Interior was subject. *Id.* The Court did not, however, hold that alteration of the federal agency's legal regime was the only way in which an agency action could satisfy the second finality requirement.

[9] Courts have consistently interpreted *Bennett* to provide several avenues for meeting the second finality requirement. We have held that "[t]he general rule is that administrative orders are not final and reviewable 'unless and until they impose an obligation, deny a right, or fix *some* legal relationship as a consummation of the administrative process.'" *Ukiah Valley Med. Ctr.*, 911 F.2d at 264 (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)) (emphasis added). The legal relationship need not alter the legal regime to which the involved federal agency is subject. *See, e.g.*, *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 482-83 (2004) (holding that EPA's order under the Clean Air Act prohibiting the Alaskan Department of Environment from issuing permits to a zinc mining company was a final agency action because the order effectively halted construction of the mine through the threat of civil and criminal penalties, despite lack of alteration of EPA's legal regime); *Cal. Dep't of Educ.*, 833 F.2d at 833 (holding that the Department of Education's letter informing state that

interest would accrue was a final agency action despite lack of alteration of the Department's legal regime); *Idaho Watersheds Project*, 307 F.3d at 828 (holding that BLM's issuance of grazing permits constituted final agency action despite lack of alteration of BLM's legal regime). These cases demonstrate that *Bennett*'s second requirement can be met through different kinds of agency actions, not only one that alters an agency's legal regime.

Indeed, we have said that an agency action may be final if it has a " 'direct and immediate . . . effect on the day-to-day business' of the subject party." *Ukiah Valley Med. Ctr.,* 911 F.2d at 264 (quoting *Standard Oil*, 449 U.S. at 239). We consider "whether the [action] has the status of law or comparable legal force, and whether immediate compliance with its terms is expected." *Id.* In light of these rules, we turn to whether an AOI has any legal effect that would qualify it as a final agency action under *Bennett's* second finality requirement.

In *Anchustegui*, the plaintiff challenged the government's attempt to impose sanctions for his failure to comply with restrictions on cattle grazing delineated in an AOI. 257 F.3d at 1126. We noted, as described above, that the Forest Service uses the AOI to set annual grazing specifications for the permit holder. Notably, we recognized that an AOI contains "directives" that, if not followed, can trigger the Forest Service to institute agency proceedings against the subject grazing permittee. *Id.* at 1126-28. While *Anchustegui* does not principally concern the function of an AOI, it aids our understanding that an AOI carries legal consequences. The administrative record in this appeal also supports this conclusion.

### a. Notices of Non-Compliance and Threatened Permit Action Against Howard and Butler Ranches

If a permittee does not comply with the directives in the AOI, the Forest Service can issue a Notice of Non-Compliance (NONC) to the permit holder. *See Anchustegui*, 257 F.3d at 1129 (explaining administrative notice process under 5 U.S.C. § 558(b),(c), with which Forest Service must comply before taking "permit action"). As the record demonstrates, the Forest Service issued a NONC to the Howard Ranch on July 14, 2004. Howard Ranch obtained a grazing permit for pastures within the Bluebucket Allotment in 1996. The 2004 AOI recommended that the Ranch monitor certain "move triggers" to increase the likelihood of moving its livestock before reaching utilization limits. It also stated a reduction in Howard Ranch's 2004 "Allowable Use Standards" based on the allotment's classification in the Malheur Forest Plan and consultation requirements under the Endangered Species Act of 1973 ("ESA"), 87 Stat. 884 (codified at 16 U.S.C. §§ 1531-43). The NONC informed Howard Ranch of its failure to meet conditions in both its grazing permit and its AOI, including exceeding utilization standards and failing to follow the 2004 AOI grazing schedule for pasture moves.[13]

On January 26, 2005, the Forest Service notified Howard Ranch that it decided to take "permit action" by suspending 25% of the Ranch's permitted head of livestock, as warned in

---

[13]The NONC stated:

> Your Term Grazing Permit # 01663, signed and dated by you, states that you will follow annual instructions of the Forest Officer. You have failed to comply with your permit . . . and your 2004 AOI (excess use in violation of Malheur Forest Plan utilization standards and failure to follow pasture move dates in AOI without advance approval from the Forest). Based on the violations of your Term Grazing Permit, I am considering suspending 25% of your permitted numbers and/or suspending your season for two years.

the NONC. The notification identified violations of the AOI and imposed a modification of the underlying grazing permit as the appropriate sanction for the violation. *See also* 36 C.F.R. § 222.4(a)(4) (authorizing Forest Service to cancel or suspend grazing permit if permittee does not comply with provisions and requirements of permit or governing regulations).

[10] Similarly, in a separate NONC to Butler Ranch for violation of the 2004 North Fork Allotment AOI, the Forest Service stated: "Failure to follow the direction set forth in the Annual Operating Instructions and my August 6 letter, and exceeding allowable use standards is a violation of . . . the terms and conditions set forth in your Term Grazing Permit," and threatened similar permit action to that taken against Howard Ranch. The Butler Ranch NONC cited permit sections that authorize the Forest Service to cancel or suspend a permit for failure to comply with, *inter alia*, the allotment management plan. As with each grazing permit involved in this appeal, this permit covered an allotment which did not have an operative allotment management plan. Thus, the permit specified that the Forest Service would enforce the Forest Plan standards, as adjusted annually with range conditions, via the AOI. The Howard and Butler Ranches' NONCs demonstrate the AOI's legal effect: failure to comply with the AOI's substantive terms can result in administrative sanctions against the permit holder.

[11] The Forest Service argues that because the sanction for an AOI violation is against the permit, the AOI has no legal effect. However, as the district court noted in its ruling denying the Forest Service's motion to dismiss, "[s]imply because an AO[I]'s authority is drawn from the permit does not make the agency's decision reflected in the AO[I] any less of a final agency action." *ONDA*, 312 F. Supp. 2d at 1343. Rather, that an AOI violation can prompt the Forest Service to take enforcement action against the non-complying permittee is a show of the AOI's "legal force" and the Forest Service's

expectation of "immediate compliance with its terms." *Ukiah Valley Med. Ctr.*, 911 F.2d at 264.

### b.   AOI Used to Impose Bull Trout ESA Standards

The legal effect of an AOI is also demonstrated by the Forest Service's use of the AOI to impose standards promulgated in the wake of the 1998 listing of the bull trout, a native salmonid species, as a threatened species under the ESA. As documented in the record, the Forest Service issued a grazing permit to Coombs Ranch for the Dollar Basin/Star Glade Allotments in 1996. The permit stated that no AMP existed for the allotments, but that the Forest Service was scheduled to develop one. It also stated that, in the meantime, the Forest Service would use the AOI "to bring management of the [allotments] into consistency with the terms of the Malheur [Forest Plan]." In 1998, the Fish and Wildlife Service ("FWS") listed the bull trout as a threatened species under the ESA, 63 Federal Reg. 31,647 (June 10, 1998), which triggered the Forest Service's duty under the ESA to consult with FWS to insure that any agency action, such as authorization of grazing, on Forest Service land would not likely jeopardize the threatened species or its habitat. *See* 16 U.S.C. § 1536(a)(2).

Since the 1998 listing, the relevant AOIs have incorporated bull trout standards and objectives. For example, the 1998 AOI for Dollar Basin/Star Glade allotments stated, "[b]eginning this year, standards and habitat objectives for bull trout are detailed for each unit." The administrative record further reflects that AOIs for the other allotments subject to bull trout standards and objectives also contained similar statements between 1998-2003. Because the Forest Service issued most of the grazing permits underlying the AOIs challenged in this litigation prior to the bull trout listing and there are no current AMPs for the allotments, the AOI was the Forest Service's principal means of imposing the new bull trout standards on the permit holders from 1998 forward. By

restricting the rights of and conferring duties on a grazing permit holder to bring the Forest Service's annual authorization of grazing into compliance with ESA requirements, the AOI is the Forest Service's definitive statement that fixes the legal relationship between the Forest Service and the permit holder. The utilization of an AOI in this manner further supports our conclusion that an AOI is a final agency action. *See Idaho Watersheds Project*, 307 F.3d at 828 ("definitive position"); *Ukiah Valley Med. Ctr.*, 911 F.2d at 264 ("fix some legal relationship").

Finally, the Forest Service argues that "[w]ithout the AOIs, the permittees would still be authorized to graze in accordance with the terms and conditions of the permit." The Forest Service's position is contradicted by the terms of the grazing permit itself and Forest Service practice. The permit does not authorize the permit holder to graze continuously for the permit's ten-year duration. Rather, the permit authorizes the permit holder to graze livestock only after the Forest Service has approved the permittee's annual application. In practice, the Forest Service approves the application in conjunction with issuance of the AOI. Although the annual application calls for basic information, it is the AOI that indicates the detailed terms and conditions by which the Forest Service expects the permit holder to graze his livestock in the upcoming season. The Forest Service's argument is not supported by the terms of the permit or by the record.[14]

---

[14]OCA similarly argues that "[a]n AOI simply allows the [Forest Service] a way to communicate with the permittees on a yearly basis regarding the implementation of the terms and conditions in the term grazing permit." However, as the Forest Service itself stated to permittee Coombs on May 27, 2004, "[t]he AOI is part of your permit . . . It is your responsibility to be familiar with and comply with your operating plan." This statement, along with the other examples in the administrative record that highlight the legal significance of the AOI, make clear that the Forest Service expects immediate compliance with the AOI. *See Indus. Customers of NW Utils.*, 408 F.3d at 646 (ruling that finality is indicated when " 'immediate compliance [with the terms] is expected' " (quoting *Cal. Dep't of Water Res. v. FERC*, 341 F.3d 906, 909 (9th Cir. 2003) (alteration in original)). The Forest Service's "own behavior [ ] belies the claim that its [annual operating instruction] is not final." *Whitman*, 531 U.S. at 479.

**IV.**

**[12]** The record supports the conclusion that an AOI is a discrete, site-specific action representing the Forest Service's last word from which binding obligations flow. These obligations have a " 'direct and immediate . . . effect on the day-to-day business' of" the permit holder. *Ukiah Valley Med. Ctr.*, 911 F.2d at 264 (quoting *Standard Oil*, 449 U.S. at 239). And, as the record demonstrates, the AOI imposes substantial and intricate legal obligations on the permit holder. For these reasons, we hold that an AOI is a final agency action subject to judicial review under § 706(2)(A) of the APA.

**REVERSED AND REMANDED.**

---

FERNANDEZ, Circuit Judge, Dissenting:

As I see it, the final agency action took place when the Forest Service issued the permits to allow grazing by certain numbers of livestock for certain periods on designated land allotments.[1] Those permits themselves provided for the possibility of cancellation or suspension. More than that, they provided for periodic changes and adjustments, as needed, for resource protection — for example, adjustment of the grazing season by changing the dates of entry and the dates of removal. In other words, the permits contemplated that the Forest Service would give instructions from time to time in order to assure that grazing was conducted in accordance with law and in a way that did not unduly damage the land itself. As relevant here, that was accomplished through the use of AOIs. Typically those are negotiated documents wherein the

---

[1]The issuance of the permits did constitute final agency action. *See* 5 U.S.C. § 551(13); *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 828 (9th Cir. 2002); *Anchustegui v. Dep't of Agric.*, 257 F.3d 1124, 1129 (9th Cir. 2001).

permitees agree with the Forest Service about the proper use of the land. The AOIs, themselves, are subject to change during the grazing season, if that becomes desirable. Instructions under the permits also reach the permitees by on-the-spot comments by Forest Service personnel or by telephone.

ONDA claims that each AOI is a final agency action for the purposes of APA review. The Forest Service claims that the instructions are mere management tools and amount to documents which implement the permits themselves. Which one is correct? The Forest Service. In reaching that conclusion, I cannot ignore the fact that the Forest Service itself believes that all it is doing is implementing the permit provisions. While I recognize that we are not bound by the Forest Service's opinions about what it is doing when it uses AOIs,[2] its "own characterization of its action . . . provides an indication of the nature of the action." *City of San Diego v. Whitman*, 242 F.3d 1097, 1101 n.6 (9th Cir. 2001); *see also Blincoe v. FAA*, 37 F.3d 462, 464 (9th Cir. 1994) (per curiam) (agency characterization not determinative, but relevant).

The Supreme Court has stated that when we make a decision about whether there is final agency action, we must consider whether an action marks the "consummation of the agency's decisionmaking process," and whether it is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78, 117 S. Ct. 1154, 1168, 137 L. Ed. 2d 281 (1997) (internal quotation marks omitted). In that sense, it can be argued that each AOI, no matter how trivially it affects the actual grazing of animals under the permit, is final agency action. Surely, in some sense it is at least a temporary consummation of the Forest Service's process of deciding (in conjunction with the permitees) what steps should be taken to

---

[2]*See Abramowitz v. U.S. EPA*, 832 F.2d 1071, 1075 (9th Cir. 1987), *superseded by statute on other grounds as recognized in Hall v. U.S. EPA*, 273 F.3d 1146, 1159 (9th Cir. 2001).

protect the resources while the animals graze upon the land. Moreover, because a violation of a duly issued AOI can subject the permitee to charges and perhaps sanctions, there can be legal consequences if the AOIs are not adhered to.

But to stop there is, I believe, a bit too formalistic because, in a sense, every step by an agency or by a permitee is the result of a then final decision and can have legal, as well as physical, consequences. Thus, a somewhat narrower and more pragmatic approach is required. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 149-50, 87 S. Ct. 1507, 1516, 18 L. Ed. 2d 681 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105, 97 S. Ct. 980, 984, 51 L. Ed. 2d 192 (1977).

That approach leads to the implementation concept. However final an action might look on its face, if it is merely implementing an earlier truly final determination, it is not final action for APA review purposes. *See Mont. Wilderness Ass'n, Inc. v. U.S. Forest Serv.*, 314 F.3d 1146, 1150 (9th Cir. 2003), *vacated on other grounds by Blue Ribbon Coal. Inc. v. Mont. Wilderness Ass'n, Inc.*, 542 U.S. 917, 124 S. Ct. 2870, 159 L. Ed. 2d 774 (2004); *Chem. Weapons Working Group, Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485, 1494 (10th Cir. 1997); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890, 899, 110 S. Ct. 3177, 3189, 3194, 111 L. Ed. 2d 695 (1990) (under APA, courts do not review mere day-to-day operations of an agency). That, of course, makes a good deal of sense. Courts are usually dealing with the front end of the process and ask if the agency has finished its consideration of a proposed action — like issuing grazing permits. But implementation is at the back end of the process when an agency decides what will be done to assure that the action taken is carried out as contemplated — for example, how will the grazing permits be utilized so that livestock gets fed and resources get protected?

In other words, the AOIs are merely a way of conducting the grazing program that was already authorized and decided

upon when the permits were issued. The AOIs reflect nothing more sophisticated or final than the "continuing (and thus constantly changing) operations"[3] of the Forest Service in reviewing the conditions of the land and its resources, and assuring that the mandated grazing programs go forward without undue disruption of the resource itself. Whether the decisions are by AOIs, or by phone calls, or by encounters in the field, or otherwise, they merely address day-to-day resource management and feeding of livestock. Review of that sort of decision is not contemplated by the APA. In fact, the Supreme Court has frowned upon broad programmatic attacks on agency action because, among other things, those would empower courts "to determine whether compliance was achieved — which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 66-67, 124 S. Ct. 2373, 2381, 159 L. Ed. 2d 137 (2004). That, of necessity, leads to a final reason that we should not accept ONDA's position.

In pragmatic terms, if every AOI for every permit in every allotment every year is to be open to litigation by ONDA, and others,[4] it is a little difficult to see how the grazing program can continue, if the purpose of the program is to feed animals. They need to eat *now* rather than at the end of some lengthy court process. But, I fear that what is really afoot is an attack by ONDA on the whole grazing program. That is no mystery — ONDA asked that the land be set aside for twenty to thirty years. It is also no mystery that broad attacks of that sort are neither within the purpose nor a proper use of APA review. *See S. Utah Wilderness Alliance*, 542 U.S. at 64, 124 S. Ct. at 2379-80; *Nat'l Wildlife Fed'n*, 497 U.S. at 891, 110 S. Ct.

---

[3]*Nat'l Wildlife Fed'n*, 497 U.S. at 890, 110 S. Ct. at 3189.

[4]They may do so seriatim. *See Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1050 (9th Cir. 2005).

at 3190. I do not think that we should let ourselves be ensnared by ONDA's little springe.

Thus, I respectfully dissent.