Opinion by Judge CHRISTEN; Dissent by Judge IKUTA.
OPINION
CHRISTEN, Circuit Judge:
The Navajo Nation appeals the district court’s dismissal of its suit seeking immediate return of human remains and associated funerary objects taken from its reservation. The Nation describes these remains and objects as “among the most sacred of [its] property” due to its deep spiritual belief that upon death humans should be placed in the earth and left there undisturbed.
Between 1931 and 1990, the National Park Service removed 303 sets of human remains and associated funerary objects from Canyon de Chelly National Monument, a sacred site on the Navajo Reservation. In the mid-1990s, the Park Service decided to inventory the remains and objects pursuant to the Native American Graves Protection and Repatriation Act (NAGPRA) with the ultimate goal of repatriating the remains and objects to culturally-affiliated tribes. The Navajo Nation *1086 sued seeking, inter alia, an injunction ending the inventory process and returning the remains and objects. The Navajo Nation argued that the Park Service’s decision to inventory the remains and objects instead of returning them violated Navajo tribal treaties, various statutes, and the Fifth Amendment to the United States Constitution. The district court dismissed the suit as barred by sovereign immunity, reasoning that the Park Service had not yet taken any final agency action as to its disposition of the remains and objects.
We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse the district court’s judgment. We hold that the distinct court had jurisdiction to consider the Navajo Nation’s claims because the Park Service’s decision to inventory the remains and objects was a final agency action within the meaning of the Administrative Procedure Act. By deciding to undertake NAGPRA’s inventory process, the Park Service conclusively decided that it, and not the Navajo Nation, has the present right to “possession and control” of the remains and objects. 25 U.S.C. § 3003(a). We reverse the district court’s order and remand for proceedings consistent with this decision.
BACKGROUND
Canyon de Chelly is a spectacularly beautiful geological site consisting of over twenty miles of red sandstone walls rising hundreds of feet above the ground. See S.Rep. No. 71-1395, at 2 (1931); Fig. 1.
Figure 1[1]
[[Image here]]
Humans have lived in the canyon’s caves for thousands of years.[2] Hopi and Pueblo Indians were the canyon’s primary occupants from roughly 750 A.D. until the 1600s.[3] The Navajo began living in the canyon in significant numbers around the *1087 late 1600s. Id. Navajo live in the canyon to this day and consider Canyon de Chelly sacred ground.[4] Navajo creation stories include events in the canyon, and Navajo lore maintains that key spiritual figures still reside there. See Kelli Carmean, Spider Woman Walks This Land: Traditional Cultural Properties and the Navajo Nation x, xvii-xx (2002).
In 1849, the United States and the Navajo Nation signed a treaty acknowledging that the Navajo Nation was “under the exclusive jurisdiction and protection of the government of the said United States.” Treaty Between the United States of America and the Navajo Tribe of Indians, U.S.-Navajo Nation, September 9, 1849, 9 Stat. 974, 974. But in 1864 the federal government forcefully and violently removed the Navajo from their lands, including Canyon de Chelly, and relocated them to Fort Sumner, 300 miles away.[5] Navajo villages and food stores were destroyed during the forced move and hundreds of Navajo died as a result of this forced relocation. Kristen A. Carpenter et ah, In Defense of Property, 118 Yale L.J. 1022, 1063 (2009). After four years of exile, the federal government allowed the Navajo to return to Canyon de Chelly, id., and in 1868 the United States and the Navajo Nation signed a second treaty ceasing hostilities and establishing, among other things, the boundaries of the Navajo Reservation, which include all of Canyon de Chelly. Treaty Between the United States of America and the Navajo Tribe of Indians, U.S.-Navajo Nation, June 1, 1868, 15 Stat. 667, 668. Under this treaty, the Navajo Reservation was “set apart for the exclusive use and occupation of the Indians.” Id. at 671.
In 1906, Congress passed the Antiquities Act, which authorized the President to establish national monuments in order to protect historic and scientifically significant sites. See 54 U.S.C. §§ 320101-320303. It also authorized the Secretaries of the Interior, Agriculture, and War to grant permits “for the examination of ruins, the excavation of archaeological sites, and the gathering of objects of antiquity.” Id. § 320302. The Department of Interior’s regulations implementing the Antiquities Act do not treat tribal trust lands differently than other federal land and do not provide any rights to individual Indians or tribes concerning the collection or disposition of artifacts or human remains. See 43 C.F.R. §§ 3.1-3.17. All collections made under the authority of the Antiquities Act must be kept in public museums or national depositories. Id. § 3.17.
In 1931, after receiving consent from the Navajo Tribal Council, the federal government created a national monument at Canyon de Chelly. 16 U.S.C. § 445. The monument encompasses Canyon de Chelly, two neighboring canyons, and lands adjacent to the canyons. Id. The act creating the monument (the Monument Act) specified that the Navajo Nation retained title to the lands within the monument, but it charged the federal government with the “care, maintenance, preservation and restoration of the prehistoric ruins, or other features of scientific or historical interest” in the monument. Id. §§ 445a-445b. Canyon de Chelly National Monument is the only national monument located on land not owned by the federal govern *1088 ment.[6] After the monument’s creation, the federal government removed certain human remains and associated cultural objects from the monument without the consent of the Navajo Nation. The National Park Service holds at least 303 sets of these remains and objects in its collection at the Western Archeology Conservation Center in Tucson, Arizona.
In 1979, Congress passed the Archaeological Resources Protection Act (ARPA), which established permit requirements for removing archaeological resources from public and Indian lands. 16 U.S.C. § 470cc. Unlike the Antiquities Act, ARPA clearly distinguishes between “public lands” and “Indian lands” held in trust by the federal government. See id. § 470bb(3)-(4). Under ARPA, a permit authorizing excavation or removal of archaeological resources located on Indian land requires the consent of the tribe, and tribes are not required to obtain a permit to excavate or remove archaeological resources on their Indian lands. Id. § 470cc(g). ARPA’s implementing regulations provide that “[ajrchaeological resources excavated or removed from Indian lands remain the property of the Indian or Indian tribe having rights of ownership over such resources,” while “[archaeological resources excavated or removed from the public lands remain the property of the United States.” 43 C.F.R. § 7.13(a)-(b). ARPA requires an agency to notify Indian tribes of possible harm to or destruction of sites the tribe may consider to have religious or cultural importance. Id. § 470cc(c). Further, ARPA gives the Secretary of the Interior authority to “promulgate regulations providing for ... the ultimate disposition” of “archaeological resources removed from public lands and Indian lands” and provides that the “ultimate disposition under such regulation of archaeological resources excavated or removed from Indian lands shall be subject to the consent of the Indian or Indian tribe which owns or has jurisdiction over such lands.” 16 U.S.C. § 470dd.
It is uncontested that 297 of the 303 sets of remains and objects were removed without the Nation’s consent, but the complaint alleges that in the 1980s the Navajo Nation consented to the Park Service’s disinterment of six sets of remains from grave sites being eroded, on the condition that they be reinterred immediately.[7] Instead, according to the complaint, the Park Service took the remains and added them to its collection at the Western Archeology Conservation Center in Tucson, Arizona.
In 1990, Congress enacted the Native American Graves Protection and Repatriation Act (NAGPRA). See 25 U.S.C. §§ 3001-3013. Section 3003 of NAGPRA states:
Each Federal agency and each museum which has possession or control over holdings or collections of Native American human remains and associated funerary objects shall compile an inventory of such items and, to the extent possible based on information possessed by such museum or Federal agency, identify the geographical and cultural affiliation of such item.
25 U.S.C. § 3003(a).[8] The inventory must include a description of each set of items, the geographical and cultural affiliation of *1089 the items, information regarding the acquisition and accession of the items, and a summary of the evidence used to determine the cultural affiliation of the items. 43 C.F.R. § 10.9(a), (c). “The purpose of the inventory is to facilitate repatriation by ... establishing the cultural affiliation between these objects and present-day Indian tribes....” Id. § 10.9(a). To that end, in creating the inventory, the agency must consult with any tribes likely to be geographically or culturally affiliatecj with the items. 25 U.S.C. § 3003(b); 43 C.F.R. § 10.9(b). The consultation process is a tribe’s opportunity to voice its reasons for seeking repatriation of the items. See 43 C.F.R. § 10.9(b)-(c). If the inventory process establishes an item’s “known lineal descendant” or “cultural affiliation” with an Indian tribe, then the agency must “expeditiously return” the item upon request. 25 U.S.C. § 3005(a)(1).
Before NAGPRA’s enactment, the Secretary of the Interior did not promulgate regulations providing for the ultimate disposition of any resources excavated or removed pursuant to ARPA. See Archaeological Resources Protection Act of 1979; Final Uniform Regulations, 49 Fed.Reg. 1,016, 1,032 (Jan. 6, 1984). After Congress passed NAGPRA, the Secretary promulgated regulations providing that NAGPRA governs the ultimate disposition of any remains and items covered by both NAG-PRA and ARPA. See 43 C.F.R. § 7.3(a)(6) (“For the disposition following lawful removal or excavations of Native American human remains and ‘cultural items’, as defined by [NAGPRA], the Federal land manager is referred to NAGPRA and its implementing regulations.”); Id. § 7.13(e) (“[T]he Federal land manager will follow the procedures required by NAGPRA and its implementing regulations for determining the disposition of Native American human remains and other ‘cultural items’, as defined by NAG-PRA, that have been excavated, removed, or discovered on public lands.”).
In the mid-1990s, the Park Service began the NAGPRA inventory process for the remains and objects it removed from Canyon de Chelly National Monument. As part of this process, the Park Service began consulting with the Navajo Nation and the Hopi and Zuni Pueblos.[9] Shortly thereafter, in June 1996, the Navajo Nation sent a letter to the Superintendent of Canyon de Chelly National Monument asserting that it owned “all human remains and associated funerary objects within the National Monument,” and objecting to the inventory process. The Park Service replied by letter stating that it would “handle all ... requests for repatriation in strict accordance with the NAGPRA” and encouraging the Navajo Nation to participate in the inventory process.
The Navajo Nation participated, but it did so under protest.[10] Although the record is sparse, it shows that the Navajo Nation engaged in ongoing dialogue with the Park Service regarding the Nation’s objections to the NAGPRA process and claims of ownership, and in 2007 the Park Service withdrew a draft inventory. Due to the continuing disagreement between the Park Service and the Navajo Nation, the Department of the Interior, of which the Park Service is a bureau, sought an *1090 opinion from its Office of the Solicitor. In an April 2010 email, the Park Service informed the Navajo Nation that Interior’s solicitor determined the Park Service “must comply with NAGPRA” and continue to inventory the remains and objects taken from Canyon de Chelly National Monument. In a June 2011 inventory consultation meeting between the Park Service and various tribes, the Park Service restated the determination made by Interi- or’s solicitor that the Park Service must “do NAGPRA on Canyon de Chelly cultural resources.” The Navajo Nation asked for a copy of the opinion, but the Park Service responded that Interior’s solicitor “did not supply an official opinion,” the opinion was “informally given,” and Interi- or would not issue any more opinions on the subject. The Navajo Nation sent a letter to the Park Service on August 9, 2011, stating its intent to sue if the Park Service did not cease the inventory process and immediately return the remains and objects. The Park Service responded with a letter, signed by the Superintendent of Canyon de Chelly National Monument, that cited the same opinion from Interior’s solicitor and reiterated the position that the Park Service was “required by law to complete the NAGPRA process for cultural items excavated or removed from lands within” Canyon de Chelly National Monument. By the time this letter was received, the inventory process had been ongoing for approximately fifteen years.
In December 2011, the Navajo Nation sued the Park Service. The complaint alleged that the Park Seviee’s refusal to immediately return the remains and objects violated the Treaty of 1849, the Treaty of 1868, NAGPRA, ARPA, the Administrative Procedure Act (APA), and the Fifth Amendment to the United States Constitution. The district court ruled that there had been no final agency action under the APA, and it dismissed the suit as barred by sovereign immunity. The Navajo Nation appealed.
STANDARD OF REVIEW
This court reviews de novo a district court’s dismissal for lack of subject matter jurisdiction. Native Vill. of Kivalina v. ExxonMobil Corp., 696 F.3d 849, 855 (9th Cir.2012).
DISCUSSION
“The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court’s jurisdiction to entertain the suit.” United States v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941) (citations omitted). The Administrative Procedure Act (APA) creates a comprehensive remedial scheme for those allegedly harmed by agency action. See 5 U.S.C. §§ 701-706. Section 702 of the APA waives sovereign immunity for suits alleging wrongful agency action or inaction. Id. § 702. It states:
A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States....
Id. Section 704 of the APA provides a right to judicial review of any “final agency action for which there is no other adequate remedy in a court.” Id. § 704.
The Park Service argues that the district court correctly dismissed all claims *1091 for lack of jurisdiction because the Park Service has not taken final agency action as to the disposition of the remains and objects removed from Canyon de Chelly. In other words, the Park Service contends that the Navajo Nation seeks to interrupt the inventory process before the Park Service has determined which tribe is culturally affiliated with the remains and objects. The Navajo Nation counters that the Park Service’s decision that NAGPRA applies to the remains and objects was a final agency action because that decision triggered the inventory process and deprived the Navajo Nation of property rights the Nation claims to enjoy under ARPA and various treaties.
We hold that the decision to apply NAGPRA to the remains and objects constituted final agency action because it was the consummation of the Park Service’s decisionmaking process regarding which statutory scheme would apply to determine the Navajo Nation’s property interests in the remains and objects, and significant legal consequences flow from the decision. Accordingly, we reverse the district court’s judgment and remand for consideration of the Navajo Nation’s claims challenging the applicability of NAGPRA.
In Bennett v. Spear, the Supreme Court stated two requirements for determining what constitutes a final agency action under the APA. See 520 U.S. 154, 177-78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). “First, the action must mark the ‘consummation’ of the agency’s decisionmaking process.... ” Id. (quoting Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113, 68 S.Ct. 431, 92 L.Ed. 568 (1948)). “[Sjecond, the action must be one by which ‘rights or obligations have been determined,’ or from which ‘legal consequences will flow.’” Id. (quoting Port of Bos. Marine Terminal Ass’n v. Rederiak-tiebolaget Transatlantic, 400 U.S. 62, 71, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970)).
As to the first Bennett requirement, an agency’s determination of its jurisdiction is the consummation of agency decisionmak-ing regarding that issue. In Fairbanks North Star Borough v. U.S. Army Corps of Engineers, the Army Corps of Engineers determined that a tract of land contained “waters of the United States” requiring the landowner to receive a permit from the Corps before developing the land. 543 F.3d 586, 589-90 (9th Cir.2008). We held that because there would be “[n]o further agency decisionmaking” as to the presence of jurisdictional wetlands on the property, the jurisdictional decision “mark[ed] the consummation of the agency’s decisionmaking process as to that issue.” Id. at 593.
Similarly here, the Park Service’s legal determination that NAGPRA’s inventory requirements apply to the remains and objects from Canyon de Chelly “markfed] the consummation of the agency’s decision-making process as to that issue.” Id. In response to the Navajo Nation’s inquiries, the Park Service sent the Navajo Nation an email notifying it that Interior’s solicitor determined the remains and objects to be subject to NAGPRA’s inventory requirements. During an in-person meeting, a Park Service official declined to provide a copy of the informal opinion and made clear that no additional decisionmaking would be forthcoming. The Park Service refused the Navajo Nation’s request for a formal, written opinion, replying that Interior’s solicitor’s opinion was “informally given” and “[t]hat was the opinion they gave.” On August 9, 2011, the Navajo Nation sent a letter to the Park Service again requesting formal resolution of its request for return of the items. In a letter dated September 7, 2011 and signed by the Superintendent of Canyon de Chel *1092 ly National Monument, the Park Service issued its final response to the demands of the Navajo Nation.
This written decision cited the prior opinion from Interior’s solicitor and denied the Navajo Nation’s claim that all the remains and objects be returned to the Navajo Nation because they belonged to them by virtue of when and where the remains were excavated. This communicated that the objects collected before NAGPRA’s effective date would not be returned prior to completion of the NAGPRA inventory process, which necessarily meant that some of the remains and objects might never be returned to the Navajo Nation, that the six sets disinterred after the enactment of ARPA would be subjected to the inventory process rather than being immediately reinterred, and that no further explanation would be forthcoming regarding NAG-PRA’s applicability.
On this record, we have no trouble concluding that the decision to follow Interior’s solicitor’s guidance and continue inventorying the remains and objects consummated the Park Service’s decision-making process as to the applicability of NAGPRA. The dissent argues that the first Bennett requirement is not satisfied because the Park Service is still in the process of determining cultural affiliation of the remains and objects pursuant to NAGPRA, overlooking that the Navajo Nation argues that NAGPRA’s statutory scheme does not apply to these objects at all. Contrary to the dissent’s further assertions, we do not conclude that the Park Service’s informal request to its lawyers for legal advice regarding NAG-PRA’s applicability was a final agency action. Nor do we hold that delay and expense transform an interlocutory decision into final agency action. It is the agency’s decision to apply NAGPRA to these remains and objects that constituted a final agency action.
The Park Service decision also meets the second Bennett requirement because the decision determined the Navajo Nation’s legal rights in the remains and objects, and legal consequences flow from the decision. A federal agency’s decision to apply NAGPRA is the agency’s legal determination of its property rights in the relevant objects. Under NAGPRA, the Park Service can only inventory the remains and objects if it has “possession or control” over them. 25 U.S.C. § 3003(a). As the district court recognized, NAG-PRA’s implementing regulations specify that possession means “having physical custody ... mth a sufficient legal interest to lawfully treat the objects as part of its collection....” 43 C.F.R. § 10.2(a)(3)(I) (emphasis added). Similarly, control means “having a legal interest ... sufficient to lawfully permit the ... Federal agency to treat the objects as part of its collection ...” Id. § 10.2(a)(3)(h) (emphasis added). The regulations clarify that control may exist “whether or not the [objects] are in the physical custody of the ... Federal agency.” Id.
The Navajo Nation contends that because its 1868 treaty provides it with the “exclusive use and occupation” of Canyon de Chelly, it owns the remains and objects that the Park Service hopes to inventory. The Nation further argues that the creation of the monument and the adoption of ARPA reaffirm its ownership interest in the remains and objects and that the Park Service has no legal interests sufficient to trigger NAGPRA’s application.
In correspondence with the Navajo Nation, the Park Service asserted that Interi- or’s solicitor determined that the Park Service has “legal possession AND control under NAGPRA.” Though the Park Service declined to provide a copy of the *1093 solicitor’s opinion, its decision to apply NAGPRA necessarily determined at least some of the Navajo Nation’s property rights in the remains and objects.
The district court ruled that the Monument Act granted the Park Service possession and control of the remains and objects sufficient to trigger NAGPRA’s inventory process, but NAGPRA applies only if the Park Service has legal possession or control over the remains and objects. See 43 C.F.R. § 10.2(a)(3)(I)-(ii). For example, if remains and objects were loaned to the Park Service, the regulatory scheme dictates that the Park Service would have no legal right of possession for purposes of NAGPRA. See id. § 10.2(a)(3)(I). It follows that the Park Service’s unexplained decision to apply NAGPRA to the remains and objects necessarily forecloses the Nation’s argument that it has complete ownership of the remains and objects pursuant to its treaty rights, and that the Monument Act and ARPA only reaffirm its ownership interest. Further, as to the six sets of remains disinterred after enactment of ARPA, the Park Service’s decision that it had a legal interest sufficient to lawfully permit it to treat the objects as part of its collection for purposes of NAGPRA denied the Nation’s claim that these sets were removed with its permission and on the condition that they be immediately reinterred. Thus, the decision to apply NAGPRA determined the Nation’s legal interests in these remains, and legal consequences flowed from the decision. Under Bennett, this decision constituted final agency action.
The dissent asserts that the Park Service’s decision to apply NAGPRA did not determine any legal rights, implying that the regulatory definitions of the terms “possession” and “control” apply only to museums. Not so. By their own terms, the definitions apply to federal agencies. See 43 C.F.R. § 10.2(a)(3)(I) (explaining that “a museum or Federal agency would not be considered to have possession” of objects on loan’ (emphasis added)); id. § 10.2(a)(3)(h) (defining control as “having a legal interest ... sufficient to lawfully permit the museum or Federal agency to treat the objects as part of its collection” (emphasis added)). This reading is entirely consistent with the Park Service’s own interpretation of the regulations.[11]
The definitions of possession and control appear in a subsection of the implementing regulations that address who must comply. Id. § 10.2(a). After defining “Federal agency,” “Federal agency official,” and “Museum,” the regulation defines “possession” and “control” in separate subpara-graphs. Id. § 10.2(a)(l)-(3). In other paragraphs of this definitions section, where the drafters wanted a subparagraph to apply only to the term defined in the immediately preceding paragraph, the drafters so indicated with a colon. See id. § 10.2(d)(2), (f)(2), (g)(5). By contrast, the definition of “museum” concludes with a period. See id. § 10.2(a)(3). The only way to read this structure consistently with the rest of the regulation is to read “possession” and “control” to apply to “Federal agency,” “Federal agency official,” and “Museum.” See generally, An-tonin Scalia & Bryan A. Gamer, Reading Law: The Interpretation of Legal Texts 161-65 (2012) (“Punctuation is a permissible indicator of meaning.”). Finally, the dissent’s interpretation would read the statute as using the words “possession” and “control” to mean lawful possession and control when applied to museums but mean only physical possession and control *1094 when applied to federal agencies. Nothing in the regulatory scheme suggests this result. See id. at 170-73 (“A word or phrase is presumed to bear the same meaning throughout a text.”).
The dissent also asserts that because the NAGPRA inventory process provides a method for determining ultimate ownership of remains and objects, an Indian tribe’s property interests in the remains and objects may only be determined at NAGPRA’s conclusion. We read the sequence of events in NAGPRA’s statutory scheme similarly as the dissent. But the dissent’s position assumes away the threshold question of whether NAGPRA’s statutory scheme applies in the first place. Here, the Navajo Nation asserts a superi- or property interest in the remains and objects deriving from treaties and statutes that predate NAGPRA. We do not prejudge whether the Nation’s attacks on NAGPRA’s applicability are correct, we merely hold that the district court had jurisdiction to consider them.
The dissent argues that Congress did not intend an agency to make a legal determination of possession and control as a part of the NAGPRA process. We agree. But because the Navajo Nation has challenged the invocation of the NAGPRA process, it is incumbent on the court to determine NAGPRA’s applicability. Congress was clear that NAGPRA’s inventory requirements only apply to “[ejach Federal agency and each museum which has possession or control” over remains and objects. 25 U.S.C. § 3003(a). Section 10.2 of NAGPRA’s implementing regulations answers the question “[w]ho must comply with these regulations?” by defining “Federal agency” and the terms “possession” and “control.” 43 C.F.R. § 10.2(a). The Park Service’s threshold determination that NAGPRA applies is subject to judicial review.
The dissent separately argues that the Park Service’s decision to apply NAGPRA does not satisfy the second Bennett factor because the Navajo Nation could simply choose not to participate in the NAGPRA process.[12] But NAGPRA requires the Park Service to complete its inventories “in consultation with tribal government[s],” 25 U.S.C. § 3003(b)(1)(A), and to seek information from tribes, including contact information for traditional religious leaders and information about the “[kjinds of objects that the [tribe] reasonably believes to have been made exclusively for burial purposes or to contain human remains of their ancestors.” 43 C.F.R. § 10.9(b)(4)(ii)-(iii). Here, the Park Service has had several in-person meetings with tribal officials to attempt to determine cultural affiliation of the remains and objects. The dissent’s suggestion that the Nation forego the right to consultation and attack the NAGPRA process at its conclusion overlooks that by sitting on the sidelines, the Nation would miss its best opportunity to establish that the remains and objects are culturally affiliated with the Navajo if the inventory process goes forward. The dissent also overlooks the Navajo Nation’s assertion that it suffers a continuing harm as long as the remains *1095 are disinterred and not returned to their tribal lands.
The Park Service argues that the Navajo Nation’s claims are unripe and that the Navajo Nation failed to exhaust administrative remedies because the NAGPRA inventory process is still ongoing, and the Park Service has not yet decided which of the remains is culturally affiliated with which tribe. But the Park Service’s argument is built on the flawed premise that the Navajo Nation asserts only that the remains should be repatriated to it pursuant to NAGPRA. In fact, the Navajo Nation claims that NAGPRA does not apply at all because the Navajo Nation, and not the Park Service, has the right to immediately possess and control the remains and objects. The Navajo Nation asserts that this right to immediate possession and control flows from the Navajo Nation’s treaty right to “exclusive use and occupation” of Canyon de Chelly. The Navajo Nation further asserts that both the 1931 Act creating Canyon de Chelly National Monument and ARPA confirm its right to immediate possession and control.
Determining whether an agencjfs decision is ripe for review “requires] us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.” Abbott Labs. v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99, 97, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Here, the Park Service’s continued possession of the remains and objects exacts a unique and significant hardship on the Navajo Nation. The Navajo believe that exhumation “causes illness[,] ... damages crops, natural ecosystems and the environment, and disrupts local and global weather patterns.” By suing for return of the remains, the Navajo Nation seeks to end the Park Service’s longstanding “exercise [of] dominion and control over these remains and objects, among the most sacred of the Nation’s property.” The question of NAGPRA’s application is fit for review because it is a purely legal question applied to discrete facts and significant legal consequences flow from the decision. See id.
Further, the Navajo Nation has exhausted all available administrative remedies for seeking review of the decision to apply NAGPRA and for obtaining possession of the remains and objects. In the fifteen years prior to filing suit, the Navajo Nation repeatedly demanded an explanation of the Secretary’s decision that NAG-PRA applies, as well as return of the remains and objects. Their efforts yielded only correspondence reporting that Interi- or’s solicitor opined that NAGPRA applies to the remains and objects, and that no further opinion will be provided by the agency.
Because both prongs of the Bennett test are met, we reverse the district court’s order and remand for review of the Navajo Nation’s claims challenging the applicability of NAGPRA.[13]
REVERSED and REMANDED.

.Places Reflecting America’s Diverse Cultures, Nat’l Park Serv., http://www.nps.gov/nr/ travel/cultural_diversity/Canyon_de_Chelly_ NationaLMonument.html (last visited Mar. 8, 2016).

. See Canyon de Chelly-History and Culture, Nat’l Park Serv., http://www.nps.gov/cach/ learn/historyculture/index.htm (last visited Mar. 8, 2016).

. Nat'l Park Serv., supra note 1.

. David M. Brugge & Raymond Wilson, Administrative. History: Canyon de Chelly National Monument Arizona, U.S. Dep’t of the Interior Nat'l Park Serv, (Jan. 1976), http:// www.nps.gov/cach/learn/historyculture/ upload/CACH_adhi.pdf.

. Nat’l Park Serv., supra note 1.

. See Brugge & Wilson, supra note 4.

. The Park Service denies that it agreed to immediately reinter the remains. But in reviewing the district court’s order granting a motion to dismiss, we accept the complaint’s allegations as true. See Bill v. Brewer, 799 F.3d 1295, 1299 (9th Cir.2015).

.A separate provision governs the disposition of items excavated or discovered after NAG-PRA's enactment. See 25 U.S.C. § 3002.

. The Navajo did not populate the Canyon de Chelly region in significant numbers until around 1700. Before then, predecessors to the modem Hopi and Pueblo occupied the region. Nat’l Park Serv., supra note 1.

. The Navajo continued to seek the immediate return of the objects consistent with their belief that exhumation "causes illness[,] ... damages crops, natural ecosystems and the environment, and disrupts local and global weather patterns.”

. See NAGPRA Glossary, Nat'l Park Serv., http://www.nps.gov/nagpra/TRAINING/ GLOSSARY.HTM (last visited Mar. 9, 2016) (quoting 43 C.F.R. § 10.2(a)(3)(i)-(ii)).

. Relatedly, the dissent argues the Navajo Nation's claims can be vindicated at the conclusion of NAGPRA and that the Nation will be made whole if the remains and objects are eventually returned. This is only partially correct. As explained, the remains and objects are sacred and their continued disinterment is alleged to cause unique harm. Further, the regulation the dissent cites for the proposition that superior property rights can only be asserted at the conclusion of the NAG-PRA process, 43 C.F.R. § 10.11(e), states that district courts may hear “any action brought that alleges a violation of [NAGPRA].” It says nothing about when such an action may be brought.

. Our decision moots the Navajo Nation's remaining jurisdictional arguments. We need not decide whether the Park Service "unlawfully withheld” agency action within the meaning of 5 U.S.C. § 706(1). Nor do we decide whether Congress waived sovereign immunity as to non-APA claims challenging intermediate agency actions. See Gros Ventre Tribe v. United States, 469 F.3d 801, 809 (9th Cir.2006).