**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SAN FRANCISCO HERRING ASSOCIATION, *Plaintiff-Appellant*, v. U.S. DEPARTMENT OF THE INTERIOR; RYAN K. ZINKE, in his official capacity as Secretary of the Interior; UNITED STATES NATIONAL PARK SERVICE; MICHAEL REYNOLDS, in his official capacity as Acting Director of the National Park Service; LAURA JOSS, in her official capacity as General Superintendent of the Golden Gate National Recreation Area, *Defendants-Appellees*. | No. 18-15443 D.C. No. 3:13-cv-01750-JST OPINION |

Appeal from the United States District Court
for the Northern District of California
Jon S. Tigar, District Judge, Presiding

Argued and Submitted October 23, 2019
San Francisco, California

Filed December 31, 2019

Before:  J. Clifford Wallace and Daniel A. Bress, Circuit Judges, and Morrison C. England, Jr.,[*] District Judge.

Opinion by Judge Bress

---

**SUMMARY**[**]

---

**Administrative Procedure Act**

The panel affirmed in part and reversed in part the district court's denial of leave to file a second amended complaint in an action brought by the San Francisco Herring Association challenging the National Park Service's authority to prohibit commercial herring fishing in the waters of the Golden Gate National Recreation Area in San Francisco Bay.

In a prior appeal, this Court held that the Association had failed to allege any final agency action under the Administrative Procedure Act, 5 U.S.C. § 704, and directed the district court to dismiss the case.  On remand, the district court allowed the Association to replead, but held that its proposed amendments still failed to allege final agency action.

The panel held that the Association's proposed second amended complaint sufficiently alleged final agency action.

---

[*] The Honorable Morrison C. England, Jr., United States District Judge for the Eastern District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel noted that in a series of formal written notices to herring fishermen, the Park Service announced that it had authority over commercial herring fishing in the waters at issue, that such fishing was prohibited under federal law, and that the Park Service would enforce the prohibition, a violation of which could lead to civil penalties and up to six months in jail.  In oral communications and meetings with the Association around this time, the Park Service reiterated its position and refused to change it.  Then, in January 2013—and in new allegations that were not before the panel in the prior appeal—uniformed Park Service rangers and California wildlife wardens allegedly operating at the Park Service's direction confronted Association members fishing in the waters of the Recreation Area and ordered them to stop fishing there.  The panel held that the Park Service's enforcement orders—backed by earlier formal Department of Interior notices and other communications making clear that commercial herring fishing in the Recreation Area violates federal law—were final agency action that could be challenged in court.

The panel held that the district court did not abuse its discretion in denying leave to add a Declaratory Judgment Act count that the Association could have brought much earlier.

**COUNSEL**

Todd R. Gregorian (argued), Emmett C. Stanton, and Amy E. Hayden, Fenwick & West LLP, San Francisco, California; Stuart G. Gross, Gross & Klein LLP, San Francisco, California; for Plaintiff-Appellant.

Anna Katselas (argued), Andrew C. Mergen, Elizabeth Ann Peterson, and Bruce D. Bernard, Attorneys; Jeffrey Bossert Clark, Assistant Attorney General; Eric Grant, Deputy Assistant Attorney General; United States Department of Justice, Environment & Natural Resources Division, Washington, D.C.; Michael T. Pyle, Assistant United States Attorney, Office of the United States Attorney, San Jose, California; Gregory Lind, United States Department of the Interior, Office of the Solicitor, Washington, D.C.; for Defendants-Appellees.

**OPINION**

BRESS, Circuit Judge:

The San Francisco Herring Association brought this lawsuit challenging the National Park Service's authority to prohibit commercial herring fishing in the waters of the Golden Gate National Recreation Area in San Francisco Bay. This appeal involves not the merits of that lawsuit, but instead whether it can be brought, at least at this time. In a prior appeal, this Court held that the Association had failed to allege any final agency action under the Administrative Procedure Act (APA), 5 U.S.C. § 704, and directed the district court to dismiss the case. *San Francisco Herring Ass'n v. U.S. Dep't of Interior*, 683 F. App'x 579 (9th Cir. 2017). On remand, the district court allowed the Association

to replead, but held that its proposed amendments still failed to allege final agency action.

We hold that the Association's proposed second amended complaint sufficiently alleges final agency action. In a series of formal written notices to herring fishermen, the Park Service announced that it had authority over commercial herring fishing in the waters at issue, that such fishing was prohibited under federal law, and that the Park Service would enforce the prohibition, a violation of which could lead to civil penalties and up to six months in jail. In oral communications and meetings with the Association around this time, the Park Service reiterated its position and refused to change it. Then, in January 2013—and in new allegations that were not before us in the prior appeal—uniformed Park Service rangers and California wildlife wardens allegedly operating at the Park Service's direction confronted Association members fishing in the waters of the Recreation Area and ordered them to stop fishing there. The fishermen complied, knowing that continuing to fish risked criminal sanction.

We hold that the Park Service's in-water enforcement orders—backed by earlier formal Department of Interior notices and other communications making clear that commercial herring fishing in the Recreation Area violates federal law—"mark[ed] the consummation of the agency's decisionmaking process" and was action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations omitted). The agency's enforcement orders were thus "final agency action" that could be challenged in court. The Park Service's contrary position—which would require the fishermen either to violate the law and risk serious punishment or engage in

unnecessary further pleas before an agency that had already made up its mind—would leave regulated parties facing stiff penalties without the judicial recourse that the APA enables. The district court did not, however, abuse its discretion in denying leave to add a Declaratory Judgment Act count that the Association could have brought much earlier.  We thus affirm in part, reverse in part, and remand.

I

The following factual allegations are taken from the Association's proposed second amended complaint and the record in both this appeal and the prior one.  Because this appeal arises from the denial of leave to amend, the allegations in the complaint "are taken as true and construed in the light most favorable" to the Association.  *Gordon v. City of Oakland*, 627 F.3d 1092, 1095 (9th Cir. 2010).

A

In 1972, Congress passed the Golden Gate National Recreation Enabling Act, establishing the Golden Gate National Recreation Area (Recreation Area or GGNRA) as part of the National Park System.  Pub. L. No. 92-589, 86 Stat. 1299 (1972) (codified at 16 U.S.C. § 460bb *et seq.*).  As relevant here, the boundaries of the Recreation Area extend one-quarter mile offshore from the coastal enclave of Sausalito, north to Bolinas Bay and beyond the historic lighthouse at Point Bonita; around Alcatraz Island; and, on the San Francisco side, from the former defense installation at Fort Mason, under the Golden Gate Bridge, past the Civil War-era fortification at Fort Point, and up to the flats of Ocean Beach.  *Id.* § 460bb-1.  Those familiar with Bay Area geography may appreciate the following map in the record, which identifies the waters in question:



A 1983 Park Service regulation prohibits commercial fishing in national parks, "except where specifically authorized by Federal statutory law." 36 C.F.R. § 2.3(d)(4). "Fishing" is defined as "taking or attempting to take fish." *Id.* § 1.4(a).     Violations of the commercial fishing prohibition are punishable by fine and up to six months in prison.     *Id.* § 1.3(a) (subjecting violators to criminal penalties under 18 U.S.C. § 1865). The ultimate issue in this case—on which we express no view—is whether, based on a series of interlocking provisions in the Golden Gate National Recreation Enabling Act, the federal government has the statutory power to regulate commercial fishing in the waters in question.

What is significant here is that the Park Service plainly believes it has that power.  After what the Association alleges is years of non-enforcement due to California's since-withdrawn objection to federal jurisdiction, the Park Service informed herring fishermen that commercial fishing

in the GGNRA was not allowed under federal law.  As relevant here, in November 2011,[1] the Park Service issued a formal notice on Department of Interior letterhead explaining that the Park Service "has the responsibility of enforcing Title 36 Code of Federal Regulations (CFR) within the Recreation Area, which includes the waters within the boundary."   According to the Park Service, "[p]er 36 CFR § 2.3(d)(4), the following are prohibited: Commercial fishing, except where specifically authorized by Federal statutory law."   The Park Service included an attachment to its November 2011 notice listing various offshore areas of the Bay and setting forth the legal basis for the United States' claimed "ownership" of the waters for purposes of the federal commercial fishing ban.   While retaining "its powers to enforce federal regulations," the Park Service explained that it was "holding its authorities in reserve at this time, should it decide the resource needs more protection beyond the State regulations."   Thus, for the time being, the Park Service would "rely on California Department of Fish and Game to respect National Park Service closures."   This November 2011 notice was included in a regulatory packet that the California Department of Fish and Wildlife (CDFW or DFW) provided to herring fishermen.[2]

In November 2012, the Park Service issued another notice on Department of Interior letterhead, which was

---

[1] Although not referenced in the Association's proposed second amended complaint, the Park Service has filed supplemental excerpts of record containing a substantially identical notice from the Department of Interior dated November 2010.

[2] The California Department of Fish and Wildlife was previously known as the Department of Fish and Game and we will refer to both interchangeably.

addressed to "2012/2013 Commercial Herring Fishermen" and signed by the Recreation Area's General Superintendent. In this updated notice, the Park Service reiterated that its regulations—including the commercial fishing ban—"are applicable to all units of the National Park System, including the waters within the boundary of GGNRA." The Park Service made clear that commercial herring fishing was thus unlawful within those boundaries: "Title 36 CFR § 2.3(d)(4) prohibits commercial fishing in all national parks, except where specifically authorized by Federal statutory law. There is no federal statute that specially authorizes commercial fishing within GGNRA; therefore, commercial fishing, including commercial herring fishing, is prohibited within GGNRA."

Unlike its November 2011 notice, the Park Service this time indicated that it would be enforcing the prohibition. While "in the past," the California Department of Fish and Game "ha[d] assisted the NPS in monitoring commercial fishing within the Park," "[d]uring the upcoming herring season the NPS will also be monitoring commercial fishing activities *and enforce* the prohibition of commercial fishing within the waters of GGNRA." (Emphasis added). "Because of reported confusion over the jurisdiction of the NPS in past years," the Park Service would "provide informational warnings to any commercial fishermen fishing within the boundaries of GGNRA." But the Park Service made clear that it "reserve[d] the right to enforce any violations of the prohibition of commercial fishing as set out in 36 C.F.R. § 2.3(d)(4)." These violations, as stated earlier, are punishable by fines and up to six months in prison. *See* 36 C.F.R. § 1.3(a); 18 U.S.C. § 1865(a).

Both before and after the November 2012 notice, the Association tried to get the Park Service to change its

position.  In October 2012, the Association's president sent the Park Service a letter objecting to the assertion of federal jurisdiction over herring fishing in the GGNRA.  That letter led to a meeting and later telephone conversations between the two sides in the fall of 2012.  The Association alleges that "[d]uring the meetings and in subsequent telephone conversations between Defendants' representatives and the fishermen's representatives, representatives for the NPS consistently expressly stated its intentions to continue to enforce the prohibition on commercial fishing contained in 36 C.F.R. § 2.3(d)(4) in the Waters at Issue, and that fishermen, including [Association] members, would be subject to criminal penalties if they fished in these waters."  In another meeting between the parties around this time, the Park Service again "confirmed [its] intention to continue prohibiting commercial fishing in the Waters at Issue as long as current laws and regulations remained in effect."  In December 2012, the Association further alleges, "an attorney for Defendants explicitly refused to state that a commercial fisherman who fished for herring in the Waters at Issue would not be cited."

Following these discussions, the Park Service in January 2013 began enforcing the commercial fishing ban, "confronting" fishermen in the waters of the GGNRA and ordering them not to fish there.  The details of these enforcement activities against individual fishermen—which are reflected in new allegations that were not before us in the prior appeal—are discussed below.

B

On April 18, 2013, the Association sued the Park Service, the Department of the Interior, and various agency officials, alleging that the federal government lacked the statutory authority to prohibit commercial herring fishing in

the GGNRA.  The Association pleaded two counts under the APA and a count for estoppel, requesting declaratory and injunctive relief (though not through a separate count under the Declaratory Judgment Act).  The Park Service moved to dismiss the estoppel claim and answered the APA claims.  In response, the Association filed a substantively identical first amended complaint that omitted the claim for estoppel.  The Park Service answered on July 18, 2013.

The Park Service acknowledges that "it did not move to dismiss for lack of final agency action in the district court." Answering Br. (ECF No. 27-1) at 20.  Instead, the parties filed cross-motions for summary judgment on the issue of the Park Service's statutory authority over the waters in the GGNRA.  The district court ruled for the Park Service on the merits and entered judgment in its favor.  *San Francisco Herring Ass'n v. U.S. Dep't of Interior*, 2014 WL 12489595 (N.D. Cal. Apr. 29, 2014).  The Park Service did not argue at summary judgment, or any time before, that the Association failed to allege final agency action, and the district court's opinion did not address that issue.

The Association appealed.  For the first time, the Park Service argued that the Association had failed to identify any final agency action, and on that basis asserted that the district court lacked subject matter jurisdiction over the Association's claims.  In this circuit, the final agency action requirement has been treated as jurisdictional.  *See, e.g.*, *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1161 (9th Cir. 2018); *San Luis Food Producers v. United States*, 709 F.3d 798, 801 (9th Cir. 2013).  After the Association clarified that it was not basing its assertion of final agency action on the Department of Interior notices, the Park Service argued that the remaining actions alleged—the presence of Park Service

"patrols" in the GGNRA and the Service's refusal to promise non-enforcement—also were not final agency actions.

In a memorandum disposition, this Court vacated the district court's judgment on the merits and "remanded with instructions to dismiss for lack of subject matter jurisdiction." *San Francisco Herring Ass'n*, 683 F. App'x at 581 (emphasis omitted). Our decision turned on our understanding of the alleged final agency action at issue, which we regarded as the Park Service's increased "patrols" in the waters of the GGNRA. As we explained:

> [The Association] is somewhat vague in describing the final agency action that it challenges. In its opening brief, it appears to describe both the informational notices sent by the Service and the Service's increased patrols as final agency action. However, in its reply brief, [it] states that it "does not challenge the [2011] notice; it challenges [the Service's] actual *ultra vires* enforcement of the regulation against [Association] members that began later that season." We construe this to mean that the [Association] is challenging the patrols, not the notices.

*Id.* at 580 n.1 (quotations omitted); *see also id.* at 580 (explaining that the Association "challenges what it views as the National Park Service's decision to enforce the regulation against [Association] members, *embodied in the Service's allegedly heightened patrol of the waters* of the Golden Gate National Recreation Area ('GGNRA') in recent years") (emphasis added).

We held that these "patrols" were not final agency action: "While actions by which an agency enforces a statute

or rule against a particular party may be 'final agency action' within the meaning of 5 U.S.C. § 704, *Sackett v. E.P.A.*, 566 U.S. 120, 125–28 (2012), the Service's patrols are at best only the first step in the enforcement process, and thus do not meet the requirements for final agency action." *Id.*

## C

On remand, and consistent with our instructions, the district court dismissed the case.  But over the Park Service's objection, the district court allowed the Association to seek leave to file a second amended complaint.  The district court explained that "[t]he Ninth Circuit remanded this case with instructions to dismiss for lack of subject matter jurisdiction but was silent as to whether the dismissal should be with or without leave."  In the district court's view, "Defendants point to nothing in the record demonstrating that the Ninth Circuit considered whether Plaintiff *could* allege facts constituting final agency action, as opposed to whether Plaintiff *did* allege such facts." (Emphasis in original).  The district court thus dismissed the case without prejudice to the Association filing a motion to amend its complaint.

On November 21, 2017, the Association sought leave to file a second amended complaint.  This time, and unlike its prior operative complaint, the Association made allegations about specific enforcement activities against individual fishermen in San Francisco Bay.   In particular, the Association alleged that in January 2013, uniformed Park Service rangers and CDFW wardens "acting as Defendants' agents" approached herring fishermen in a popular herring spawning area on the Marin County side of the Bay, within the GGNRA.  The fishermen were either in the process of surveying the spawn and preparing to drop nets, or in one case had already dropped nets and begun fishing for herring.

The proposed second amended complaint alleges that Park Service rangers and California wardens operating at the Park Service's direction ordered Association members to stop fishing in the waters of the GGNRA:

- On January 13, 2013, fisherman and Association member Ernie Koepf was "surveying the spawn" off the coast of Sausalito in the waters of the GGNRA, deciding where to drop his nets. As he was doing so, two uniformed Park Service rangers in a National Park Service vessel approached him from the direction of the shoreline of the GGNRA. The officers "indicated that they were law enforcement officers from the GGNRA and that they were asserting authority in the waters," and instructed Mr. Koepf as to "the boundary of the area in which he was not allowed to fish." Mr. Koepf had previously received the November 2012 notice from the Park Service and was aware that a "fisherman violating the prohibition could be subject to criminal prosecution." Mr. Koepf "understood that if he disobeyed the rangers' instructions concerning the boundary and set his lines on the side of the boundary that the rangers had told him was the demarcation of the Waters at Issue, he would be subject to federal criminal prosecution." Mr. Koepf therefore "obeyed the instructions" and "left the Waters at Issue . . . rather than risk criminal prosecution."

- In January 2013, Association members Dennis Deaver, Matt Ryan, and Nick Sorokoff separately entered the waters of the GGNRA and were "surveying the spawn in preparation for setting their nets." Each fisherman was "approached by CDFW wardens acting as agents of" the Park Service and

was told "that they could not set their nets in the waters."  These three fishermen had each received the November 2012 Park Service notice and "understood . . . on the basis of that letter, that they would be subject to criminal prosecution if they ignored the instructions."  The fishermen therefore "left the Waters at Issue."

- Between January 11–14, 2013, Association member Domenic Papetti was commercially fishing for herring in the GGNRA and "set his nets" in the waters near the border of Marin and Sausalito. "After setting his nets and while engaged in tending the nets, he was approached by CDFW wardens, who acting as agents of Defendants, instructed him that commercial fishing in the area was prohibited and instructed him to remove his nets."  Mr. Papetti had previously received the November 2012 notice from the Park Service indicating "he would be subject to criminal prosecution if he ignored the instructions."  Mr. Papetti therefore "complied with the instructions, removed his nets, and re-set them outside of the Waters at Issue, rather than risking criminal prosecution."

The Association's proposed second amended complaint also included a new count for declaratory relief under the Declaratory Judgment Act.

The district court denied leave to amend.  While acknowledging that the proposed second amended complaint "include[d] more detailed allegations regarding specific enforcement activities," the district court held that these "are not new allegations" because "[t]hese interactions between NPS rangers and [Association] members were

included in the [first amended complaint], albeit with somewhat less detail." The district court also noted that interactions between rangers and fishermen were "acknowledged in oral argument" before our Court and in our Court's memorandum disposition. In the district court's view, "[a]dding additional details about how the NPS specifically patrolled the waters to prevent [Association] members from harvesting herring does not overcome the jurisdictional defect identified by the Ninth Circuit." The district court therefore denied leave to amend as futile. The district court also denied leave to add the new count under the Declaratory Judgment Act based on the "strong evidence of undue delay."

This appeal followed.

II

Before turning to the question of whether the Association's latest complaint alleges final agency action, we must first address the Park Service's threshold contentions that our prior opinion precluded leave to amend altogether, or at least dictated that the Association still does not allege final agency action. The district court rejected the former argument but accepted the latter. In our view, the Park Service is wrong on both points.

The district court correctly determined that this Court's prior opinion did not prevent the Association from seeking leave to re-plead. "Absent a mandate which explicitly directs to the contrary, a district court upon remand can permit the plaintiff to file additional pleadings . . . ." *Nguyen v. United States*, 792 F.2d 1500, 1502 (9th Cir. 1986) (quotations omitted); *see also Sierra Club v. Penfold*, 857 F.2d 1307, 1312 (9th Cir. 1988). Here, the mandate in the prior appeal "did not expressly address the possibility of

amendment, nor was there indication of a clear intent to deny amendment seeking to raise new issues not decided by the prior appeal." *Nguyen*, 792 F.2d at 1503. Instead, by describing the Park Service's "patrols" as "at best only the first step in the enforcement process," our prior opinion, if anything, suggested that there may well be further enforcement activities that could meet the final agency action requirement. *San Francisco Herring Ass'n*, 683 F. App'x at 580. The district court thus correctly determined that this Court's prior opinion did not purport to shut the courthouse doors to the fishermen under any and every circumstance.

We part ways with the district court, however, in its determination that our prior opinion encompasses the Association's new allegations of enforcement, and therefore rendered the Association's motion for leave to amend futile. Under the "rule of mandate," a lower court is unquestionably obligated to "execute the terms of a mandate." *United States v. Kellington*, 217 F.3d 1084, 1092 (9th Cir. 2000); *see also United States v. Thrasher*, 483 F.3d 977, 981 (9th Cir. 2007). Compliance with the rule of mandate "preserv[es] the hierarchical structure of the court system," *Thrasher*, 483 F.3d at 982, and thus constitutes a basic feature of the rule of law in an appellate scheme. But while "the mandate of an appellate court forecloses the lower court from reconsidering matters determined in the appellate court, it 'leaves to the district court any issue not expressly or impliedly disposed of on appeal.'" *Nguyen*, 792 F.2d at 1502 (quoting *Stevens v. F/V Bonnie Doon*, 731 F.2d 1433, 1435 (9th Cir. 1984)). In this case, while we appreciate the district court's evident effort faithfully to comply with this Court's prior ruling, we hold that the district court read that ruling too broadly.

Most centrally, the Association's allegations of specific in-water enforcement orders to individual fishermen are, in fact, new.  They were neither included in the complaint that was at issue in the prior appeal, nor addressed in our prior decision.  Instead, we were careful to explain that while the Association was "somewhat vague in describing the final agency action that it challenges," we understood the Association to be challenging "the Service's allegedly heightened patrol of the waters."  *San Francisco Herring Ass'n*, 683 F. App'x at 580 & n.1; *see also id.* at 580 n.1 ("We construe this to mean that the [Association] is challenging the patrols."); *id.* at 580 ("The Service's patrols of the GGNRA do not constitute final agency action.").

We also expressly distinguished "patrols" from further enforcement of the commercial fishing ban against particular persons—which is what the Association now alleges.  In our prior opinion, we specifically recognized that "actions by which an agency enforces a statute or rule against a particular party may be 'final agency action' within the meaning of 5 U.S.C. § 704," but held that "the Service's patrols are at best only the first step in the enforcement process."  *Id.* at 580–81.  Our prior opinion therefore contemplated that actions such as in-water enforcement directives—involving government officials ordering individual fishermen not to fish in a certain area and fishermen complying due to the risk of punishment—are qualitatively different than rangers merely monitoring the waters of the GGNRA with greater frequency.  The district court thus erred in treating our prior opinion as dispositive of whether the Association's new allegations challenge final agency action.

This same point disposes of the Park Service's related argument that the law of the case doctrine bars further

litigation of the final agency action issue.  "For th[at] doctrine to apply, the issue in question must have been decided explicitly or by necessary implication in the previous disposition."  *Thrasher*, 483 F.3d at 981 (quotations omitted).  For the reasons set forth above, our prior opinion did not decide whether the Park Service's orders to individual fishermen not to fish in the waters of the GGNRA, premised on the Park Service's prior formal notices and other communications, constituted final agency action.  We thus turn to that question next, applying *de novo* review because the district court denied leave to amend on grounds of futility.  *See, e.g.*, *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 893 (9th Cir. 2010); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

## III

Under 5 U.S.C. § 704, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  There is no suggestion that the agency action here is "made reviewable by statute."  The question is thus whether the Association has sufficiently alleged "final agency action."  We hold that it has done so and is therefore entitled to pursue judicial relief.

While it can sometimes be difficult to discern if the agency's decisional process is truly final, this is not such a case.  The agency here repeatedly declared its authority over the waters of the GGNRA in formal notices, refused to change its position when pressed, and then enforced its fishing ban against individual fishermen, potentially subjecting them to serious penalties.  It raises questions of basic fairness for the Park Service to assert its jurisdiction over the fishermen and bring them to the precipice of punishment through in-water enforcement orders, only to

later claim there is nothing conclusive here for the fishermen to even challenge.  The APA's judicial review provisions prevent precisely this "heads I win, tails you lose" approach.

It is of course true that not every enforcement interaction in the field will reflect a final action of the agency itself.  In this case, however, and for reasons we now explain, the rangers' "no fishing" orders, which implemented the agency's unequivocal assertion of authority in its notices and other communications, constitute final agency action that may be challenged in court.

A

For there to be "final agency action," 5 U.S.C. § 704, there must first be "agency action."  The Park Service's threshold suggestion that there is not even federal government action in the first place—that enforcing its clearly-stated commercial fishing prohibition against individual fishermen was somehow a non-event under the APA—fails under the facts as alleged in the proposed second amended complaint.

The APA defines "agency action" broadly to "includ[e] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13); *see also id.* § 701(b)(2).  This definition "is meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (citing *FTC v. Standard Oil Co. of Cal.*, 448 U.S. 232, 238 n.7 (1980)).  The term "sanction" is defined expansively to "includ[e]," among other things, "the whole or a part of an agency . . . prohibition, requirement, limitation, or other condition affecting the freedom of a person, . . . or taking other compulsory or restrictive action."  5 U.S.C. § 551(10)(A),

(G).   An "order" "means the whole or part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than a rule making but including licensing." *Id.* § 551(6).   The Park Service presents no argument that the government conduct challenged here fails to meet either definition.

Instead, the Park Service argues that "only one of the five alleged patrols purportedly involved the Park Service, and [the Association] has not identified any deputization agreement authorizing the DFW to exercise federal law enforcement authority on the Park Service's behalf or otherwise explained the basis of its assertion that DFW was acting as the Park Service's agent during the other four alleged patrols." Answering Br. 25–26.   This argument fails.

It is hard to credit the Park Service's suggestion—not raised below—that the Association, at the pleading stage, has not sufficiently alleged that California wildlife wardens were operating at the direction of the Park Service.   The Park Service's own November 2011 notice to fishermen, attached to the proposed complaint, states that the Park Service "will rely on California Department of Fish and Wildlife to respect National Park Service closures . . . ."   The Park Service ensured delivery of this November 2011 notice to fishermen by having the CDFW include it in CDFW's own "herring season regulatory packet" for fishermen.   The Park Service's subsequent November 2012 notice, also attached to the proposed complaint, likewise references California wardens having "assisted the NPS in monitoring commercial fishing within the Park."   And the Park Service itself has proffered a letter asking the CDFW to include the November 2012 Department of Interior notice "with the permit application sent to commercial herring fishermen," while expressing

appreciation "for continuing the partnership between California Department of Fish and Game and the NPS."

The Park Service does not dispute that "agency action" under 5 U.S.C. § 704 can include actions taken at an agency's direction, nor does it cite any authority for the proposition that something as formal as a "deputization agreement" is required. *See Indep. Broker-Dealers' Trade Ass'n v. SEC*, 442 F.2d 132, 137 (D.C. Cir. 1971) (reviewing agency action under the APA where the agency was "significantly involved" "in a way and to an extent that cannot be ignored as devoid legal materiality," so that the "involvement of a government agency is meaningful enough to call for application of vital principles of judicial review"). Indeed, the Park Service's own regulations define "[a]uthorized person" to mean "employee *or agent* of the National Park Service with delegated authority to enforce the provisions of this chapter," 36 C.F.R. § 1.4(a) (emphasis added), and those regulations further provide that "authorized persons" may enforce the commercial fishing regulations in national parks, *see id.* § 2.3(f).

In all events, by the allegations of the proposed second amended complaint, two officers *from the Park Service* ordered one fisherman (Ernie Koepf) not to fish in the GGNRA after identifying themselves as federal law enforcement and asserting authority over the waters. And the prior actions that enabled the in-water enforcement orders, such as the formal notices on Department of Interior letterhead and verbal commitments to enforce federal law in the GGNRA—not to mention 36 C.F.R. § 2.3(d)(4)—were undertaken by the Park Service itself. Based on these prior actions, Koepf understood that if he disobeyed the rangers' orders, he would be subject to federal prosecution.

These allegations pertaining to Mr. Koepf, an Association member, are alone enough to sustain this action. *See, e.g.*, *United Food & Comm. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)); *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1092 (9th Cir. 2017). Under these circumstances, and taking the Association's well-pleaded allegations as true, *see, e.g.*, *Gordon*, 627 F.3d at 1095, the Association's proposed second amended complaint sufficiently alleges federal agency action.

The Park Service nevertheless argues that "[a]n agency's restatement of what already exists in the relevant body of statutes, regulations, and rulings is not a 'rule' within the meaning of the APA because it does not implement, interpret, or prescribe law or policy." Answering Br. 26 (quotations omitted). This argument is beside the point. The definition of "agency action" is not limited to "rules." *See* 5 U.S.C. § 551(13). And the Association is not challenging the agency's overarching rule on commercial fishing in national parks *per se*, *see* 36 C.F.R. § 2.3(d)(4), but rather the Park Service's *application and enforcement* of that rule against individual commercial herring fishermen in the GGNRA, which occurred many years after the underlying rule was promulgated.

This case is thus a far cry from the cases the Park Service cites involving agency "guides" containing answers to frequently asked questions, *see Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 430–31 (4th Cir. 2010), or an agency letter to a single entity that "was purely informational in nature" and "[c]ompell[ed] no one to do anything," *Ind. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427–28 (D.C. Cir. 2004). Suffice to say, ordering fishermen not to fish on

pain of fines and imprisonment—backed by formal agency notices clearing up the "reported confusion over the jurisdiction of the NPS" in the GGNRA—is not analogous to a mere "restatement" of the law.

B

But was this agency action nonetheless final?  We hold that it was.  The Supreme Court has set forth "two conditions that generally must be satisfied for agency action to be 'final' under the APA": "'First, the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *U.S. Army Corps. of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett*, 520 U.S. at 177–78); *see also, e.g.*, *Sackett v. EPA*, 566 U.S. at 126–27; *Navajo Nation v. U.S. Dep't of Interior*, 819 F.3d 1084, 1091 (9th Cir. 2016); *Oregon Natural Desert Ass'n v. U.S. Dep't of Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006); *Alaska, Dep't of Envtl. Conservation v. EPA*, 244 F.3d 748, 750 (9th Cir. 2001).  These two conditions reflect what the Supreme Court has described as "the 'pragmatic' approach [it] ha[s] long taken to" final agency action. *Hawkes*, 136 S. Ct. at 1815 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)); *see also Oregon Natural Desert Ass'n*, 465 F.3d at 982 (collecting cases).  By the standards the Supreme Court has set forth, the Association has sufficiently alleged final agency action.

*First*, the action "mark[ed] the consummation of the agency's decisionmaking process" and was not "of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 177–78.  By the allegations of the proposed complaint, the in-water enforcement orders that the fishermen challenge here

were an unequivocal assertion of the Park Service's authority over the waters of the GGNRA, based upon the Park Service's lengthy history of statements on that issue. The Park Service had issued multiple formal notices on Department of Interior letterhead over a period of years, definitively asserting federal jurisdiction over the waters of the GGNRA and making clear that commercial herring fishing there violated federal law, thus exposing fishermen to civil penalties and jail time.  By November 2012, the Park Service had announced its intention "[d]uring the upcoming herring season" to "enforce the prohibition on commercial fishing within the waters of GGNRA."  And in meetings and other communications between the parties around this time, the Association has alleged that "representatives for the NPS consistently expressly stated its intentions to continue to enforce the prohibition on commercial fishing contained in 36 C.F.R. § 2.3(d)(4) in the Waters at Issue, and that fishermen, including [Association] members, would be subject to criminal penalties if they fished in these waters." Subsequently, and critically, the Park Service then put its declared position into action when its uniformed officers and California wardens (allegedly acting at the federal government's direction) took to the waters to order herring fishermen to stop fishing in the GGNRA.

To such a herring fisherman in San Francisco Bay, there was probably not much about this that felt "merely tentative." *Bennett*, 520 U.S. at 178.  The Park Service had "arrived at a definitive position," *Oregon Natural Desert Ass'n*, 465 F.3d at 985: it had jurisdiction over the waters of the GGNRA and the fishermen identified in the complaint were violating federal law by fishing there.  As we have held, "[a]s to the first *Bennett* requirement, an agency's determination of its jurisdiction is the consummation of agency decisionmaking regarding that issue."  *Navajo*

*Nation*, 819 F.3d at 1091; *see also Hawkes*, 136 S. Ct. at 1814 (citing *Sackett*, 566 U.S. at 131 (Ginsburg, J., concurring)).

When an agency decision is merely tentative, the final agency action requirement ensures that courts do not intrude on the agency's turf and thereby meddle in the agency's ongoing deliberations. *See, e.g.*, *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 411, 414 (D.C. Cir. 2011); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986); *see also Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 (9th Cir. 1990). The Park Service does not suggest it is still in the middle of trying to figure out its position on whether it has jurisdiction over the waters of the GGNRA, and that this action somehow prematurely inserts the courts into the mix.

Rather, when Park Service officers and agents went out on the waters of the GGNRA to implement the commercial fishing prohibition against individual Association members, the Park Service's position was a fait accompli. *See Sackett*, 566 U.S. at 127 ("The issuance of the compliance order also marks the consummation of the agency's decisionmaking process.") (quotations omitted). If there were any doubt before, the Park Service's enforcement orders against individual fishermen "crystalliz[ed] [the] agency position into final agency action within APA § 704's meaning." *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 49 (D.C. Cir. 2000). Simply put, an agency engaging in "merely tentative or interlocutory" thinking, *Bennett*, 520 U.S. at 178, does not state a definitive position in formal notices, confirm that position orally, and then send officers out into the field to execute on the directive. Where an agency takes such steps, its decisionmaking processes are clearly consummated.

When the government was asked at oral argument what more the fishermen were supposed to do before filing this action, its answer was that the Association could have petitioned the Park Service to engage in a rulemaking.  But when there was already final agency action, the fishermen were not required to engineer a *further* final agency action in a different form in order to bring suit.  As in *Sackett*, the fishermen here had "no entitlement to further agency review," and "[t]he mere possibility that [the] agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal."  566 U.S. at 127; *see also Hawkes*, 136 S. Ct. at 1814 (explaining that while the Army Corp of Engineers "may revise" a Clean Water Act "jurisdictional determination," "[t]hat possibility . . . is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal").  Once again, a central rationale of the final agency action requirement is to prevent premature intrusion into the agency's deliberations; it is not to require regulated parties to keep knocking at the agency's door when the agency has already made its position clear.

This conclusion follows from the APA itself.  Congress has authorized agencies to engage in "agency action" in different ways, *see* 5 U.S.C. § 551(13), and has provided for judicial review when that action is "final," 5 U.S.C. § 704.  Rulemaking through the notice and comment process is, of course, one way to engage in "agency action" that can, in turn, lead to "final agency action" challengeable in court. *See, e.g.*, *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1450–51 (9th Cir. 1996), *as amended* (June 17, 1996).

But given the breadth of the definition of agency action, *see* 5 U.S.C. § 551(13), there will be many final agency actions that do not take the form of rules.  *See Oregon*

*Natural Desert Ass'n*, 465 F.3d at 987 ("*Bennett*'s second requirement can be met through different kinds of agency actions, not only one that alters an agency's legal regime."). We have never held that a party subjected to final agency action in one form must then pursue an often cumbersome rulemaking process to satisfy the final agency action prerequisite a second time. Indeed, if a rulemaking were required here, the same could also have been said of the many other cases finding final agency action through decision-making mechanisms other than rules. *See, e.g.*, *Hawkes*, 136 S. Ct. at 1813–15 (Army Corp of Engineers "jurisdictional determination"); *Sackett*, 132 S. Ct. at 1371–72 (EPA compliance order); *Navajo Nation*, 819 F.3d at 1086 (Park Service decision to inventory property); *Alaska, Dep't of Envtl. Conservation*, 244 F.3d at 750 (EPA enforcement orders). We have no license to limit the scope of final agency actions to "rules." And the Park Service—having undertaken enforcement activities confirming its decision-making process was not only consummated, but operationalized—has no license to force the fishermen into an unnecessary rulemaking process either.

*Second*, the orders that individual fishermen stop fishing in the GGNRA met *Bennett*'s second requirement because this was agency action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78. Again, there is no dispute that based on the Park Service's position, persons who engaged in commercial fishing in the GGNRA could be punished through fines and imprisonment. *See* 36 C.F.R. § 1.3(a); 18 U.S.C. § 1865. Indeed, in meetings and telephone conversations with the Association, Park Service representatives "expressly stated" that herring fishermen "would be subject to criminal penalties if they fished in these waters." By confronting fishermen in the waters of the

GGNRA and ordering them to stop fishing there, the fishermen were necessarily placed "in legal jeopardy if [they] fail[ed] to comply with the [o]rders." *Alaska, Dep't of Envtl. Conservation*, 244 F.3d at 750.  Such exposure to "the risk of significant criminal and civil penalties" satisfies *Bennett*'s second requirement.  *Hawkes*, 136 S. Ct. at 1815; *see also Frozen Food Express v. United States*, 351 U.S. 40, 44 (1956) (holding that order was final agency action because it "warns every carrier, who does not have authority from the Commission to transport those commodities, that it does so at the risk of incurring criminal penalties").

In this case, there is no suggestion that compliance with the Park Service's orders to fishermen was somehow optional, and neither the Park Service nor the fishermen treated them that way.  The in-water orders were instead a display of "legal force" where "immediate compliance" was expected.  *Oregon Natural Desert Ass'n*, 465 F.3d at 987 (quotations omitted).  Indeed, failure to comply with the rangers' orders itself exposed the fishermen to even further adverse legal consequences beyond the violation of the commercial fishing prohibition.  *See* 36 C.F.R. § 2.32 (Park Service regulations concerning failure to follow "the lawful order of a government employee or agent" and "resisting" "a government employee or agent engaged in an official duty"); *see also Sackett*, 566 U.S. at 126 (holding that legal consequences flowed under *Bennett*'s second requirement because "the order exposes the Sacketts to double penalties in a future enforcement proceeding"); *Alaska, Dep't of Envtl. Conservation*, 244 F.3d at 750 (holding that legal consequences flowed because "[u]nder EPA's construction of its Orders, if it decides to institute [enforcement] proceedings, Cominco and its employees would be subject to criminal and civil penalties for the violation of its Orders, as well as for violation of the [Clean Air Act]").

These various legal consequences resulting from the Park Service's in-water enforcement orders to individual fishermen fundamentally distinguish the Association's proposed second amended complaint from the alleged final agency action in the prior appeal, which was limited to "increased patrols" of San Francisco Bay. *See San Francisco Herring Ass'n*, 683 F. App'x at 580–81 & n.1. Those patrols did not themselves compel any fisherman to do anything or create legal jeopardy for anyone. The patrols were instead akin to the types of "day-to-day operations" of an agency that do not meet the final agency action requirement. *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 801 (9th Cir. 2013).

What the Association has alleged now is very different. By taking the additional step of enforcing its formal notices against the fishermen, the in-water "no fishing" orders reflected not only the "consummation of the agency's decisionmaking process," but the Park Service's determination to create actual "legal consequences" for violators. *Bennett*, 520 U.S. at 177–78 (quotations omitted); *see also Siskiyou Reg. Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 554 (9th Cir. 2009) (final agency action where party "challenge[s] specific instances of the Forest Service's actions taken pursuant to its interpretation of" an agency mining guideline). In the prior appeal, the Park Service argued that "unlike the Sacketts, members of [the Association] have not been ordered to do anything, nor did the November 2011 notice expose [the Association's] members to any penalties." Answering Brief of Appellees at 30, *San Francisco Herring Assoc. v. U.S. Dep't of Interior*, No, 15-16214, ECF No. 28. Assuming that to be true of the Park Service's notices, the same cannot be said of the Association's new allegations of actual enforcement activities against individual fishermen.

This case is thus markedly different from cases the Park Service cites where agencies merely issued administrative complaints. *See, e.g.*, *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 242 (1980); *Ukiah Valley*, 911 F.2d at 264–65. By their very nature, those cases involved attempts to short-circuit agency adjudicatory processes that were, at best, still in process or even at their inception. *See Standard Oil*, 449 U.S. at 242. For that reason, the administrative complaints did not "impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process." *Ukiah Valley*, 911 F.2d at 264 (quotations omitted). "[I]mmediate compliance" there was not expected, and the parties who received the complaints were "not yet subject to any order requiring them to act." *Id.* at 264–65. By virtue of the Park Service's decision to proceed in the way that it did here, the agency action in this case cannot be described in similar terms.

For much the same reasons, this case also bears no resemblance to the line of cases the Park Service relies upon, where agencies merely issued preliminary guidance or opinions restating the law. *See* Answering Br. 26–28 (collecting cases). In *City of San Diego v. Whitman*, 242 F.3d 1097 (9th Cir. 2001), to take one case as an example, we held that a letter from the EPA to a municipality was not final agency action where "[t]he EPA's decision-making process on the City's application . . . will not even begin until the City files its application," and where the letter "simply responds to the City's request for assistance" by offering guidance on whether EPA would apply certain statutory provisions to the city's "as-yet-unfiled application." *Id.* at 1101–02. Here, by contrast, the Park Service issued enforcement orders based on its repeated prior notices that commercial fishing was prohibited in the waters of the GGNRA. The position was definitive and the legal

consequences for fishermen were real—"the hallmarks of APA finality." *See Sackett*, 566 U.S. at 126.

The Park Service therefore cannot fairly say that the orders to individual fishermen "merely restate[d] existing law." Answering Br. 26. In some sense, an enforcement directive, sanction, or compliance order can always be described as "restating existing law." The EPA compliance order in *Sackett*, for example, could be regarded as a restatement of the Clean Water Act's requirements. What the Park Service's characterization ignores is that by their very form and nature, enforcement orders like the ones at issue here—based on clearly-stated agency pronouncements and repeated refusals to change course—are not free-floating legal guidance but actual commands to actual regulated parties to engage or refrain from engaging in a particular action, subject to penalty. *See Sackett*, 566 U.S. at 126–27. The APA's final agency action requirement prevents this "strong-arming of regulated parties into 'voluntary compliance' without the opportunity for judicial review—even judicial review of the question whether the regulated party is within the [Park Service's] jurisdiction." *Id.* at 131.

Once again, the question is asked: what more were the fishermen supposed to do before bringing suit? At oral argument and in its brief, the Park Service suggested that the fishermen could have violated the law and then sued. *See, e.g.*, Answering Br. 26 (stating that the Association "does not allege that any of its members received a citation"). It is hard to fault the fishermen for obeying a law enforcement order instead of flouting it. And perhaps unsurprisingly, precedent on the "final agency action" question did not require Association members to call the Park Service's bluff and engage in what the government regards as unlawful behavior. As the Supreme Court "ha[s] long held, parties

need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of 'serious criminal and civil penalties.'" *Hawkes*, 136 S. Ct. at 1815 (quoting *Abbott Labs.*, 387 U.S. at 153).  The herring fishermen "need not assume such risks while waiting for [the Park Service] to 'drop the hammer' in order to have their day in court." *Id.* (quoting *Sackett*, 566 U.S. at 127).

We therefore hold that on the particular facts alleged, the Association's proposed second amended complaint sufficiently pleaded final agency action.

IV

The district court also denied, on grounds of undue delay, the Association's proposed addition of a new count under the Declaratory Judgment Act.  We review this aspect of the district court's ruling for abuse of discretion, *see Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995), and conclude none occurred.

We have explained that "[l]ate amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action." *Royal Ins. Co. of Am. v. Sw. Marine*, 194 F.3d 1009, 1016–17 (9th Cir. 1999) (quotations omitted).  In addition, the "discretion to deny leave to amend is particularly broad where the plaintiff has previously amended the complaint." *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990) (quotations omitted).

The district court did not abuse its discretion on this issue.  Unlike the new factual allegations that the Association added to address the final agency action issue first identified in the prior appeal, the Association's

proposed count under the Declaratory Judgment Act adds only a new legal theory, despite the fact its prior complaints already requested declaratory relief.  The Association does not explain how its new count could add anything to the final agency action issue (and it does not).  Given the substantial delay involved, the duplicative nature of the relief requested in the new count, and the Association's previous amendment of its complaint, *see Allen*, 911 F.2d at 373, the district court's refusal to allow the Declaratory Judgment Act count was not an abuse of discretion.

\*       \*       \*

For the foregoing reasons, we reverse the district court's denial of leave to amend, except as to its disallowance of the Association's proposed count under the Declaratory Judgment Act.

**AFFIRMED in part, REVERSED in part, and REMANDED.**